**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: DOMESTIC DRYWALL ANTITRUST LITIGATION | **CIVIL ACTION** **MDL No. 13-2437** **15-cv-1712** |
| **THIS DOCUMENT RELATES TO:** **Ashton Woods Holdings LLC, et al.,** **Plaintiffs,** **v.** **USG Corp., et al.,** **Defendants** | |

Baylson, J.                                                                                    July 8, 2019

## <u>MEMORANDUM RE: MOTION FOR SUMMARY JUDGMENT (CHOICE-OF-LAW)</u>

### I.      Introduction

In this multidistrict litigation, Plaintiffs, twelve large homebuilders who purchased gypsum wallboard (drywall) (collectively, "Plaintiffs"),[1] allege that Defendants, drywall manufacturers, conspired to eliminate job quotes and fix prices for the calendar years 2012 and 2013.  Only three Defendants remain in this case: PABCO Building Products, LLC ("PABCO"); the United States Gypsum Company ("USG") and the United States Gypsum Corporation ("USG Corp.") (together, "USG"); and USG Corp.'s wholly-owned subsidiary, L&W Supply Corporation ("L&W").  The Third Amended Complaint (ECF 110, "TAC")–the operative Complaint in this action–alleges four Counts:

---

[1] Plaintiffs are Ashton Woods Holdings, L.L.C. ("Ashton Woods"); Beazer Homes Holdings Corp. ("Beazer Homes"); CalAtlantic Group, Inc. ("CalAtlantic"); D.R. Horton Los Angeles Holding Company, Inc. ("D.R. Horton"); Hovnanian Enterprises, Inc.; KB Home; Meritage Homes Corporation; M/I Homes, Inc.; Pulte Home Corporation; The Drees Company; Toll Brothers, Inc.; and Tri Ponte Homes, Inc. ("Tri Pointe").

1. **Count I**: Violation of the Sherman Act, 15 U.S.C. § 1, by all Plaintiffs against all Defendants, seeking declaratory and injunctive relief, pre- and post-judgment interest, and costs, including attorneys' and expert fees;

2. **Count II**: Violation of the Sherman Act, 15 U.S.C. § 1 by Plaintiffs Ashton Woods and D.R. Horton against all Defendants, seeking declaratory and injunctive relief, pre- and post-judgment interest, and costs, including attorneys' and expert fees;

3. **Count III**: Violations of the California Business & Professions Code §§ 16750(a), et seq. ("Cartwright Act") and, in the alternative, state antitrust and restraint of trade laws in Illinois, North Carolina, Arizona, District of Columbia, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, Oregon, Tennessee, West Virginia, and Wisconsin by all Plaintiffs against all Defendants, seeking damages, pre- and post-judgment interest, and costs, including attorneys' and expert fees;

4. **Count IV**: Violations of state consumer protection and unfair competition laws of California, Colorado, Florida, Nevada, New Mexico, North Carolina, South Carolina, and Virginia by all Plaintiffs against all Defendants, seeking damages and/or restitution, pre- and post-judgment interest, and costs, including attorneys' and expert fees.

Currently before this Court is Defendants' Motion for Summary Judgment on Choice-of-Law (ECF 316, "MSJ"). At issue is Plaintiffs' allegation that they may pursue all of their state antitrust claims in Count III under California's Cartwright Act. (TAC ¶ 273.) Defendants seek dismissal of state antitrust claims made by Plaintiffs' purchasing entities that are headquartered in states that have not repealed Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977) ("non-repealer states"). Non-repealer states do not allow indirect purchasers to seek recovery from antitrust violators, unlike California, a "repealer state."[2] The parties agree that Alabama, Delaware, Georgia, Indiana, Kentucky, Louisiana, Maryland, New Jersey, Ohio, Pennsylvania, Texas, and Washington are non-repealer states. (See MSJ at 23.)[3]

---

[2] Throughout this Homebuilder action, Plaintiffs have disputed whether they are direct or indirect purchasers of drywall. The Court does not reach any conclusions as to whether Plaintiffs qualify as indirect purchasers in ruling on the instant Motion.
[3] As discussed at oral argument on the Motion for Summary Judgment, the parties dispute whether three states– Colorado, Virginia, and South Carolina–are repealer or non-repealer states. (See ECF 380, "Oral Arg. Tr." at 32:24–33:7.) The amicus brief in Stromberg v. Qualcomm Inc., which Defendants submitted to this Court, reveals that there is no genuine dispute that Colorado and Virginia are non-repealer states, and that South Carolina is a repealer state. (See ECF 387 Ex. A at 20.)

For the reasons discussed below, Defendants' Motion is DENIED IN PART.

## II.    Background

### A.    Procedural History

As the Court has provided a thorough summary of the procedural history in this multidistrict litigation in several prior opinions, the Court includes only the procedural history relevant to the instant Motion.  (See, e.g., ECF 351 ("February 2016 MSJ Opinion") (granting in part and denying in part manufacturers' motions for summary judgment in the direct and indirect purchaser actions)[4]; ECF 101 ("Homebuilder MTD Opinion") (granting in part and denying in part Defendants' motion to dismiss Plaintiffs' state law and Sherman Act § 1 claims in the Second Amended Complaint))[5].)

Plaintiffs filed the TAC on August 12, 2016 against Defendants USG; L&W; New NGC, Inc.; Continental Building Products, Inc. ("Continental")[6]; CertainTeed Gypsum, Inc. ("CertainTeed"); American Gypsum Company LLC ("American Gypsum"); and PABCO.  (ECF 110.)  Defendants New NGC, Inc., USG, L&W, and CertainTeed filed Answers to the TAC on August 26, 2016.  (ECF 121 (Answer by New NGC, Inc.); ECF 123 (Answer by PABCO); ECF 124 (Answer by USG Entities: L&W and USG); ECF 125 (Answer by CertainTeed).)  On the same date, all Defendants filed a Partial Motion to Dismiss the state consumer protection and unfair competition law claims–Count IV of the TAC–which the Court denied (ECF 122, 163).

On September 8, 2016, the Court approved the parties' Joint Stipulation dismissing all claims in the TAC against Defendant Continental with prejudice (ECF 129).  The following year,

---

[4] The February 2016 MSJ Opinion is available on the MDL docket (No. 13-MD-2437) and at In re Domestic Drywall Antitrust Litigation, 163 F. Supp. 3d 175 (E.D. Pa. 2016) (Baylson, J.).
[5] The Homebuilder MTD Opinion is available on the Homebuilder action docket (No. 15-cv-01712) and at In re: Domestic Drywall Antitrust Litigation Civil Action, No. 15-cv-1712, 2016 WL 3769680 (E.D. Pa. July 13, 2016) (Baylson, J.).
[6] Before the TAC was filed, on June 22, 2016, the Court dismissed Continental from the action (ECF 93, 94). Plaintiffs named Continental as a Defendant in the TAC to preserve all rights on appeal.  (TAC at 1 n.2.)

on February 6, 2017, the Court granted Plaintiffs' unopposed Motion for Dismissal of CertainTeed, dismissing all claims against CertainTeed with prejudice (ECF 178). On May 21, 2018, the Court approved the parties' Joint Stipulation voluntarily dismissing all claims against American Gypsum (ECF 300).

On July 2, 2018, Defendants USG, L&W, New NGC, Inc., and PABCO moved for summary judgment with respect to claims arising from purchases made by Plaintiffs in non-repealer states, which do not allow indirect purchasers to recover damages for antitrust violations (ECF 316). On July 31, 2018, the parties filed a Joint Stipulation, which the Court approved, voluntarily dismissing all claims against Defendant New NGC, Inc. with prejudice, leaving Defendants USG, L&W, and PABCO in the action (ECF 331).

The following month, on August 27, 2018, Plaintiffs filed a Response in opposition to the Motion for Summary Judgment, arguing that summary judgment should be denied because Defendants failed to rebut the presumption that California law applies to all of Plaintiffs' claims, including those claims arising from purchases in non-repealer states that do not allow indirect purchaser claims (ECF 340, "Resp."). Plaintiffs attached to the Response a Separate Statement of Material Facts (ECF 781, "Pls. Supp. SOF").[7]

Defendants filed a Reply on September 17, 2018, reiterating that California law should not apply to all of Plaintiffs' claims, but rather, that the law of the states where purchases occurred should govern (ECF 350, "Rep."). Defendants also filed a Response to the Separate Statement of Material Facts (ECF 351, "Defs. Resp. SOF").

On February 19, 2019, Plaintiffs filed a Request for Judicial Notice of the then-pending Apple, Inc. v. Pepper case before the Supreme Court (ECF 375). According to Plaintiffs, an

---

[7] Plaintiffs' Statements of Facts can be found on the MDL docket.

amicus brief filed by non-repealer states in that case, attached as Exhibit A to the Request for Judicial Notice, confirmed that there was no "true conflict" between the interests of California and non-repealer states and, therefore, California law should be applied to all of Plaintiffs' state antitrust claims (ECF 375 at 3; id. Ex. A). Defendants filed a Response on March 5, 2019, arguing that the amicus brief was irrelevant to the choice-of-law issue and seeking to refute Plaintiffs' contention that the amicus brief revealed that non-repealer states have no interest in preventing indirect purchaser recoveries under their states' laws (ECF 377 at 2–3).

On March 12, 2019, the Court held oral argument on the Motion for Summary Judgment (ECF 378–81). Following oral argument, on June 3, 2019, both parties filed Notices regarding the Supreme Court's decision in Apple, Inc. v. Pepper, 139 S.Ct. 1514 (2019) (ECF 385, 386). On June 21, 2019, Defendants filed a Request for Judicial Notice of an amicus brief filed by the states of Louisiana, Ohio, Texas, and the Department of Justice in the pending Ninth Circuit case of Stromberg v. Qualcomm Inc., No. 19-15159 (9th Cir. 2019) (ECF 387). Plaintiffs filed a Response on June 28, 2019 (ECF 389).

### B. UNDISPUTED FACTS

The following is a fair account of the factual assertions relevant to the instant Motion, as taken from both parties' Statements of Facts, and are not genuinely disputed.

#### i. Parties

##### 1. Plaintiffs

Plaintiffs allege that during the relevant time period–January 1, 2012 through December 31, 2015–they purchased drywall in Alabama, Arizona, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nevada, New

Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, and Wisconsin that was manufactured by Defendants. (TAC ¶ 4.) During the relevant period, three Plaintiffs were headquartered or had their principal places of business in California: CalAtlantic, KB Home, and TRI Pointe. (Pls. Supp. SOF ¶¶ 45–47). The states where Plaintiffs have their headquarters and/or principal places of business are as follows:[8]

1. **Ashton Woods**, the named Plaintiff in this action, is a Georgia limited liability company with its principal place of business in Georgia. (MSJ Ex. 2, "DSOF" ¶ 1; ECF 781, "PSOF" ¶ 1.) None of the eight Ashton Woods entities that purchased drywall were incorporated in or have their principal places of business in California. (DSOF ¶ 2.)

2. **Beazer Homes** was incorporated in Delaware and has its principal place of business in Georgia. (Id. ¶ 3.) None of its three entities[9] that purchased drywall were incorporated or have their principal places of business in California. (Id. ¶ 4.)[10]

3. **CalAtlantic** was incorporated in Delaware and has its principal place of business in California. (Id. ¶ 5.) Two of its purchasing entities, Standard Pacific Corp. and Ryland Group, Inc., both have their principal places of business in California and purchased drywall during the relevant time period. (Id. ¶ 6.)[11] In total, CalAtlantic Group, Inc.'s purchasing entities purchased 103,725 millions of square feet ("msf") of drywall in California during the relevant time period. (Pls. Supp. SOF ¶ 45). (DSOF Ex. 16.)[12]

---

[8] Appendix A to Defendants' Motion is a chart of each Plaintiff's state of incorporation/organization, headquarters, and the amount of drywall each Plaintiff purchased. (MSJ App. A.)

[9] Plaintiffs dispute Defendants' use of the term "separately-organized entity" to the extent that it implies that the entities did not function with the unified purpose of building and selling homes under the same Beazer Homes Holding Corp. name. (See PSOF ¶ 4.) Plaintiffs raise the same argument with respect to D.R. Horton; The Drees Company; Hovnanian Enterprises, Inc.; and KB Home. (Id. ¶¶ 4, 10, 12, 14.)

[10] The parties dispute whether any Beazer entities purchased drywall in California during the relevant time period. (Compare Pls. Supp. SOF ¶ 48 (stating that from January 1, 2012 through December 31, 2015, Beazer Homes purchased drywall in California "through its subsidiaries and affiliates"), with Defs. Resp. SOF ¶ 48 (stating that because no Beazer Homes Holdings Corp. entities were located in California, they did not make purchases in California during the relevant time period).) Defendants also argue that purchases by Beazer Homes are governed by Georgia law pursuant to Beazer Homes's purchase agreement. (Defs. Resp. SOF ¶ 48; id. Ex. 122.)

[11] It is undisputed that several of Standard Pacific Corp. and Ryland Group, Inc.'s California divisions purchased drywall. (See Defs. SOF Ex. 16.)

[12] Defendants contend that CalAtlantic did not purchase any drywall, but that Standard Pacific Corp. and Ryland Group, Inc., CalAtlantic's purchasing entities, did. (Defs. Resp. SOF ¶ 45.) Plaintiffs admit that CalAtlantic's purchasing entities "technically purchased the wallboard upon which Cal Atlantic Asserts its claims," but contend that Standard Pacific Corp. and Ryland Group, Inc. purchased drywall on behalf of CalAtlantic Group, Inc. (PSOF ¶ 6; Pls. Supp. SOF ¶ 45.)

4. **D.R. Horton** was incorporated in California and has its principal place of business in Texas. (DSOF ¶ 7.) Of its 27 entities that purchased drywall, seven were incorporated in or have their principal places of business in California: Continental Residential, Inc., which was incorporated in and has its principal place of business in California and purchased 437.15 msf; D.R. Horton BAY, Inc., which has its principal place of business in California and purchased 26,430.75 msf; D.R. Horton Ven, Inc., which was incorporated in and has its principal place of business in California and purchased 4,130.92 msf; D.R. Horton, Inc.–Sacramento, which was incorporated in and has its principal place of business in California and purchased 2,238.91 msf; DRH Cambridge Homes, Inc., which was incorporated in California and purchased 21,075.53 msf; DRH Southwest Construction, Inc., which was incorporated in California and purchased 32.41 msf; and Western Pacific Housing, Inc., which has its principal place of business in California and purchased 15,174 msf. (Id. ¶ 8; id. App. A.) In total, from January 1, 2012 through December 31, 2015, D.R. Horton and/or its purchasing entities purchased 71,986 msf of drywall in California. (Pls. Supp. SOF ¶ 49.)[13]

5. **The Drees Company** was incorporated in and has its principal place of business in Kentucky. (DSOF ¶ 9.) Of its four entities that purchased drywall, none were incorporated in or have their principal places of business in California. (Id. ¶ 10.)

6. **Hovnanian Enterprises, Inc.** is a Delaware corporation with its principal place of business in New Jersey. (Id. ¶ 11.) Of its 15 entities that purchased drywall, two were incorporated in or have their principal places of business in California: K. Hovnanian Companies of California, Inc., which was incorporated and has its principal place of business in California and purchased 27,928 msf of drywall, and K. Hovnanian JV Services Company, L.L.C., a California limited liability company with its principal place of business in Florida that purchased 5,070 msf of drywall. (Id. ¶ 12; id. App. A.) In sum, Hovnanian Enterprises, Inc. and/or its entities purchased 27,928 msf of drywall in California from January 1, 2012 through December 31, 2015. (Pls. Supp. SOF ¶ 50.)[14]

7. **KB Home** was incorporated in Delaware and has its principal place of business in California. (DSOF ¶ 13.) Three of its nine entities that purchased drywall during the relevant tie period were incorporated in or have their principal places of business in California: Fremont Pat Ranch, LLC, which purchased 35 msf of drywall; KB Home Arroyo Vista, LLC, which purchased 1,865 msf; and KB

---

[13] The parties dispute whether these purchases may be attributed to D.R. Horton or only to its purchasing entities. (See Pls. Supp. SOF ¶ 49; Defs. Resp. SOF ¶ 49.)
[14] Defendants deny that Hovnanian Enterprises, Inc., which has its principal place of business in New Jersey, purchased drywall. (Defs. Resp. SOF ¶ 50.)

Home South Bay Inc., which is both incorporated and headquartered in California and purchased 21,628 msf. (Id. ¶ 14; id. App. A.)[15]

8. **Meritage Homes Corporation** was incorporated in Maryland and has its principal place of business in Arizona. (DSOF ¶ 15.)[16]

9. **M/I Homes, Inc.** was incorporated in and has its principal place of business in Ohio. (Id. ¶ 17.) None of its 14 entities that purchased drywall were incorporated or have their principal places of business in California. (Id. ¶ 18.)

10. **Pulte Home Corporation** was incorporated in Michigan and has its principal place of business in Georgia. (Id. ¶ 19.)[17]

11. **Toll Brothers, Inc.** was incorporated in Delaware and has its principal place of business in Pennsylvania. (Id. ¶ 21.) Three of its four purchasing entities that bought drywall were formed in or have their principal places of business in California: Plum Canyon Master LLC, a Delaware limited liability company with its principal place of business in California, which purchased 1,177 msf of drywall; Porter Ranch Development Co., a California joint venture with its principal place of business in California that purchased 2,209 msf; and Shapell Industries, Inc., which was incorporated in Delaware and has its principal place of business in California and purchased 8,566 msf. (Id. ¶ 22.) From January 1, 2012 through December 31, 2015, Toll Brothers, Inc. and/or its purchasing entities purchased 47,089 msf of drywall in California. (Pls. Supp. SOF ¶ 53.)[18]

12. **TRI Pointe** was incorporated in Delaware and has its principal place of business in California. (DSOF ¶ 23.) Of its seven entities that bought drywall, two were incorporated in or have their principal places of business in California: Pardee Homes, which was incorporated in and has its principal place of business in California and purchased 32,258 msf of drywall, and TRI Pointe Contractors, LP, a Delaware limited partnership with its principal place of business in California that purchased 33,355 msf. (Id. ¶ 24.) From January 1, 2012 through

---

[15] The parties dispute whether KB Home or its purchasing entities purchased drywall in California. (See Pls. Supp. SOF ¶ 46; Defs. Resp. SOF ¶ 46.)

[16] The parties dispute whether Meritage Homes Corporation purchased 49,764 msf of drywall in California. (Compare Pls. Supp. SOF ¶ 51 ("From January 1, 2012 through December 31, 2015, . . . Meritage Homes Corporation purchased 49,764 msf of drywall in the State of California."), with Defs. Resp. SOF ¶ 51 ("Meritage Homes . . . has its principal place of business of Arizona. Meritage has no separately organized entities which purchased [drywall]. As a result, Meritage had no purchases in California during the relevant time period.").) Defendants also argue that Meritage's claims are governed Arizona law pursuant to the purchase agreement. (Defs. Resp. SOF ¶ 51; id. Ex. 123.)

[17] The parties dispute whether Pulte Home Corporation purchased drywall in California. (Compare Pls. Supp. SOF ¶ 52 ("From January 1, 2012 through December 31, 2015, Plaintiff Pulte Home Corporation purchased 51,881 msf of drywall in the State of California."), with Defs. Resp. SOF ¶ 52 ("Pulte Home Corporation has its principal place of business in Georgia. Pulte has no separately-organized entities which purchased [drywall]. As a result, Pule had no purchases in California during the relevant time period.").)

[18] Defendants contend that purchases by Toll Brothers, Inc. were governed by Pennsylvania law pursuant to the purchase agreement. (Defs. Resp. SOF ¶ 53; id. Ex. 124.)

December 31, 2015, TRI Pointe and/or its purchasing entities bought 65,100 msf of drywall in California.  (Pls. Supp. SOF ¶ 47.)[19]

## ii.  Defendants

Defendant USG, which is headquartered in Illinois, a repealer state, operates a gypsum mine and manufactures drywall in California.  (Pls. Supp. SOF ¶¶ 5–6.)  USG also operates 14 drywall "plants" in Alabama, Florida, Indiana, Iowa, Maryland, Oregon, Pennsylvania, Texas, Utah, and Virginia.  (Defs. Resp. SOF ¶ 5.)  Further, USG operates gypsum rock mines and quarries in eight cities, including in Indiana, Iowa, Michigan, Oklahoma, Texas, and Utah.  (Id. ¶ 5.)  USG manufactures paper for drywall in four cities, including in Michigan, Missouri, New York, and Texas.  (Id.)

Defendant L&W was the largest distributor of drywall and related building products in the United States during the relevant time period.  (Pls. Supp. SOF ¶ 8.)  During this time period, L&W, a wholly-owned subsidiary of USG, sold drywall manufactured by USG, PABCO, and American Gypsum.  (Defs. Resp. SOF ¶ 9.)  Until L&W was acquired by ABC Supply Co., Inc. in 2016, L&W purchased 90% of its drywall from USG.  (Pls. Supp. SOF ¶¶ 7, 9.)  L&W was also one of PABCO's largest customers; its purchasers comprised 10% of PABCO's sales and 6% of L&W's business.  (Pls. Supp. SOF ¶ 12; Defs. Resp. SOF ¶¶ 11, 12.)  Of the 6% of L&W's business that consisted of purchases from PABCO, the majority of that business was conducted in California.  (Pls. Supp. SOF ¶ 12; Defs. Resp. SOF ¶ 12.)

---

[19] Plaintiffs' Statement of Facts "admit[s] that the [] seven entities (majority of which were acquired by TRI Pointe in 2014) technically purchased the drywall upon which TRI Pointe asserts its claims."  (PSOF ¶ 24.)  However, in Plaintiffs' Separate Statement of Facts, Plaintiffs attribute these drywall purchases to TRI Pointe, which Defendants dispute.  (Compare Pls. Supp. SOF ¶ 47 (averring that TRI Pointe Homes, Inc. purchased drywall), with Defs. Resp. SOF ¶ 47 ("Defendants deny that TRI Pointe Homes, Inc. purchased any drywall during the relevant time period. Instead, seven separately-organized entities purchased wallboard.").)

PABCO, the smallest manufacturer among Defendants with a 4% national market share, is a limited liability company organized under the laws of Nevada and headquartered in California. (Defs. Resp. SOF ¶ 1.) PABCO began manufacturing and shipping drywall from its California facility in 1972, and it operates one paper mill in California that supplies to drywall production facilities. (Pls. Supp. SOF ¶¶ 1–3.) PABCO, which operates in 75 locations across the United States and Canada and employs individuals in 11 states, is the only remaining Defendant that is headquartered in California. (Defs. Resp. SOF ¶¶ 1, 4.) PABCO and USG have been operating in California for nearly fifty years. (Pls. Supp. SOF ¶¶ 4, 5.)

### C. Alleged Conspiratorial Conduct in California

The parties do not dispute the following chronology of material facts. The Court considered the February 2016 MSJ Opinion to determine which facts were material and, where applicable, the Court provides the same description of events. The Court limits its analysis to material facts pertinent to the instant Motion but includes relevant background for context.[20]

1. **5/15/2011: PABCO and L&W internal reports confirm communications regarding PABCO and L&W price increases as well as USG's plans.**

Mark Burkhammer (PABCO's Director of Sales) emailed Ryan Lucchetti (President of PABCO), Foster Duval (PABCO's Southern California Sales Manager), and Todd Thomas (PABCO) and stated, "Just spoke to Marty Brand [(L&W)] and he informed me that USG is still planning on going up at the end of the month . . . hasn't heard about others . . . just FYI." (Id. ¶ 25 n.26.)

---

[20] In addition to the facts summarized above, Plaintiffs allege that Defendants facilitated and maintained the conspiracy by participating in trade association meetings and a retirement dinner in California during the relevant time period. (See Pls. Supp. SOF ¶¶ 41–44.) As Defendants recognize, when these meetings were identified by the Class Plaintiffs in support of their motion for summary judgment, the Court stated that it "w[ould] not give weight to any evidence that shows a bare opportunity to conspire, without more." (Defs. Resp. SOF ¶¶ 41–44 (quoting February 2016 MSJ Opinion at 37).) The Court maintains the same position in the instant Motion and does not consider the trade association meetings or dinner in its analysis.

Mr. Burkhammer, who was responsible for all drywall sales made by PABCO in California during the relevant time period, works out of his home in Tracy, California and in PABCO's offices in both Newark and Rancho Cordova, California. (Pls. Supp. SOF ¶ 15; Defs. Resp. SOF ¶ 15.) Mr. Lucchetti was also based in California. (Pls. Supp. SOF ¶ 30.) Mr. Duval, who was also based in California, testified that he was tasked with meeting with customers to discuss product availability, pricing, "programs in place," and contractors that preferred to use PABCO's product line. (Defs. Resp. SOF ¶ 19; id. Ex. Q, Duval Dep. Tr. at 67:5–69:25.)

2. **9/19/2011: Dave Powers (President of American Gypsum) called Mr. Duval (PABCO).**

The call lasted 19 minutes. (February 2016 MSJ Opinion at 57.) In his deposition testimony, Mr. Powers explained that he "seriously debated" whether to place the call because he knew that American Gypsum was about to release its price increase announcement that would eliminate job quotes, create calendar-year pricing, and impose a 35% price increase for January 1, 2012. (Id.) However, Mr. Powers decided to call Mr. Duval because Mr. Duval was a personal friend who had just had open-heart surgery. (Id.) Mr. Powers testified that they "mostly discussed Mr. Duvall's [sic] health and family, but that they ended the call as they always did by slamming their former employer, USG, which involved talking about a lack of leadership in the industry." (Id.) Mr. Duval does not remember the call or what was discussed, but he did not contest that it occurred. (Id. at 58.)

3. **9/20/2011: American Gypsum circulated an announcement to customers that it would implement a 35% price increase and end job quotes effective January 1, 2012.** (Id.)

4. **9/20/2011–9/21/2011: PABCO's President commented on the American Gypsum announcement.**

The day after Mr. Powers and Mr. Duval's phone call, a customer forwarded American Gypsum's price increase announcement to Mr. Lucchetti (PABCO).  (Pls. Supp. SOF ¶ 30.)  Mr. Lucchetti forwarded the announcement to Mr. Duval and wrote, "Well here is the 1st."  (<u>Id.</u>)  Mr. Duval responded, "Dave [Powers] gave me a call yesterday and mentioned his frustration with the lack of leadership in the industry.  Eliminating job quotes would be a great start for the price improvement."  (<u>Id.</u> ¶ 31.)  The next day, Mr. Lucchetti replied, "Dave Powers is my new hero."  (<u>Id.</u>)

Mr. Burkhammer (PABCO) also received Mr. Lucchetti's email forwarding the announcement and stating, "Well here is the 1st."  (February 2016 MSJ Opinion at 59.)  Mr. Burkhammer forwarded the email to Marty Brand, Vice President of Sales and Operations at L&W, and wrote, "Hope this works."  (<u>Id.</u>)  Mr. Brand responded, "Interesting idea. I hope this does fly. I like the way they put it out there 2-1/2 months ahead of time!"  (Pls. Supp. SOF ¶ 21.)  Mr. Burkhammer responded by stating, "probably not legal but what the heck."  (<u>Id.</u> ¶ 22.)

Both Mr. Burkhammer and Mr. Brand worked in California.  (<u>Id.</u> ¶¶ 14–17; Defs. Resp. SOF ¶¶ 14–17.)  Mr. Brand worked out of his home in Yorba Linda, California, and in L&W's office in Orange, California.  (Pls. Supp. SOF ¶¶ 16–17.)  During at least part of the relevant time period, Mr. Brand and his supervisor, Rob Waterhouse, made decisions on pricing.  (Defs. Resp. SOF ¶ 18.)

5. **9/27/2011: PABCO and L&W employees based in California discussed the elimination of job quotes.**

One week later, on September 27, 2011, after only American Gypsum announced the 35% price increase to take effect in January 2012, Mr. Burkhammer (PABCO) invited Mr. Brand (L&W) to dinner in an email.  (February 2016 MSJ Opinion at 63.)  In the email, Mr. Burkhammer wrote:

Look forward to seeing you and sharing some tales…maybe talk a little strategy if all the announcements are out by then. Even though we haven't officially stated our intention I sent an email to the troops getting them ready. No more job quotes and 30 days to close any open quotes getting our system down to secured work through our distributors with footage and address's [sic]. I am suggesting, wherever and to whoever [sic] will listen, that the manufacturers have to police. . . .

. . .

. . . . Other distributors have not pushed back as anticipated…the small independents are uptight. I did quote a job in northern Cal that starts in Feb….2mmsft….ends in July….with the support of the distributor…even tho we haven't announced yet…we quoted up 40 dollars on 1-1-12. I don't know how this will all work out but it has some people thinking…but getting something done by seven manufacturers for the good of the industry is like being in the house of reps in DC.

(Pls. Supp. SOF ¶ 20.) Mr. Brand testified that he had no advance notice of USG's pricing plans before he received USG's September 28, 2011 letter. (Defs. Resp. SOF ¶ 20.)

6. **9/28/2011: USG sent letter announcing elimination of job quotes and a shift to calendar-year pricing, but not announcing the specific amount of the January 1, 2012 increase.** (February 2016 MSJ Opinion at 63.)

7. **10/12/2011: PABCO announced elimination of job quotes and implementation of calendar-year pricing with a 35% increase.** (Id. at 66.)

8. **10/12/2011: Phil Kohl, Vice President of Sales & Marketing at PABCO, sent a memo to PABCO leadership based in California indicating that unanimous manufacturer action would be required to achieve price improvement.**

Mr. Kohl sent a memo titled "July 2011 Market Condition Report" to Mr. Lucchetti (PABCO), copying Mr. Burkhammer (PABCO), Mr. Duval (PABCO), and Todd Thomas (PABCO), among others. (Pls. Supp. SOF ¶ 34.) The "General Market Conditions" section states, in relevant part:

All wallboard manufacturers need this [$35 increase for calendar year 2012] to become profitable again. As stated last month, a $35 increase can happen if all players maintain a unanimous resolve to tighten pricing and strictly police all existing quotes with no exceptions. Just allowing one customer to abuse one quote could be the catalyst for the collapse of the hoped for increase.

(Pls. Supp. SOF ¶ 34; id. Ex. JJ.)[21]  Both Mr. Kohl and Mr. Lucchetti were based in California.

(Pls. Supp. SOF ¶ 34.)

9. **12/2011: Internal L&W communications allegedly demonstrated the need for pricing discipline.**  (See Pls. Supp. SOF ¶ 33.)

In a December 15, 2011 email from Mr. Brand (L&W) to several L&W Regional Mangers, Mr. Brand wrote:

> I just got off a conference call concerning drywall pricing discipline going forward. I need all of you to make sure that we are firm in our pricing;
>
> 1) Every customer (no exceptions) are [sic] going up at least $40/msf on 1-2-12. . .
> .
> 3) Whatever the market number is now, we MUST hold to at least +$40/msf on all quoting going forward, no matter what our competitors are doing.  Rob Waterhouse and I are the only ones who will be making decisions coming off that direction. . .
> .
> . . .
>
> There will be a lot of contractors that will lie about what our competitors are doing on price.  Some contractors will switch business in an attempt to get us to move our number down.  We are willing to lose business to hold firm on this increase.  Please get back to me asap with your low (pre-increase) market sell price on wallboard. In So Cal, it is $165/msf and +$40/msf = $205/msf.  This is the number that I want you to make sure we do not quote below without talking to me.  Also, no reductions in every day price to any customers without discussing with me.  It is extremely important that everyone understands this in each of your regions.  There is so much riding on this increase, anything less than this compliance will not be tolerated.

(Pls. Supp. SOF ¶ 33; id. Ex. P.)  As noted above, Mr. Brand was working in California.  Chad Popma, the Northwest Regional Manager at L&W, who was located in Oregon, responded with the "NW low market number" prior to the increase.  (Pls. Supp. SOF Ex. P.)[22]

---

[21] Defendants contend that this email does not reflect illegal activity, but rather is evidence of legal, conscious parallelism.  (Defs. Resp. SOF ¶ 34 (citing Valspar Corp. v. E.I. Du Pont De Nemours & Co., 873 F.3d 185, 200 (3d Cir. 2017)).)

[22] Defendants state that this email exchange "at most reflects the legal process of setting pricing in anticipation of competitor actions in an oligopolistic industry."  (Defs. Resp. SOF ¶ 33.)

Later that month, in an internal L&W email between Mr. Brand and Gerald Killian, Regional Manager of the Mountain West Region of L&W, Mr. Brand declined a request for a lower priced bid and stated, "[T]his would be viewed by . . . distributors and manufacturers as us not supporting the increase.  We cannot send that message to the market place [sic]."  (Pls. Supp. SOF ¶ 35; id. Ex. KK.)

> 10. **1/2012: PABCO and L&W employees based in California communicated about supporting price increases.**

On January 20, 2012, Mr. Burkhammer (PABCO) again emailed Mr. Brand (L&W) and wrote, "Our message to the market is that we will pull any deviated payers, (quotes or deviations) if they are not used in the manner they were intended.  We believe it is our role to do everything possible to maintain transparency and signal support for the increase we all need so desperately."  (Pls. Supp. SOF ¶ 23; id. Ex. T.)

Also in January 2012, Mr. Burkhammer communicated the need for manufacturers to support the price increases to Mr. Brand.  (Pls. Supp. SOF ¶ 24.)  For example, on January 5, 2012, Mr. Burkhammer forwarded an email to Mr. Brand stating, "I hope they know we are up [in price] and support this increase."  (Id.; id. Ex. T.)[23]

> 11. **6/26/2012: Mr. Burkhammer (PABCO), who was based in California, emailed PABCO employees stating, "I would be very careful about stepping into other markets and dropping competitive numbers."**

---

[23] (See also Pls. Supp. SOF Ex. V (August 15, 2011 email from Mr. Burkhammer to Mr. Brand and others ("I wanted to confirm that Pabco is going to support the upcoming increase and the number being tossed around is ten dollars.")); Pls. Supp. SOF Ex. W (October 25, 2012 email thread between Mr. Burkhammer and Mr. Brand (discussing PABCO's increase letter and confirming that PABCO would not be issuing job quotes in 2013)).)

Mr. Burkhammer emailed Mr. Kohl (PABCO) and Mr. Thomas (PABCO) and warned them about "stepping into other markets and dropping competitive numbers. We don't need that kind of press." (Pls. Supp. SOF ¶ 38; id. Ex. NN.)[24]

12. **8/6/2012: PABCO and L&W employees communicated, through their offices in California, about going on "allocation" to maintain the alleged conspiracy.**

On August 6, 2012, Mr. Burkhammer (PABCO) sent an internal memo to Mr. Lucchetti (PABCO) indicating that Mr. Burkhammer had been informed by Mr. Brand (L&W) of USG's intention to go on allocation to protect the next round of price increases. (Pls. Supp. SOF ¶ 40 n.59; id. Ex. PP); (see also id. (citing id. Ex. QQ) (August 3, 2012 email from Mr. Burkhammer (PABCO) to Mr. Thomas (PABCO) and Mr. Duval (PABCO) discussing preparations to go on allocation)).)[25]

13. **10/24/2012: PABCO issued its price increase letter reflecting a 30% increase for 2013.** (February 2016 MSJ Opinion at 88.)

14. **11/30/2012: L&W noted that it could not accommodate a lower price for any customers because to do so "would show our competition that we are protecting work and that would have the potential to harm the chances of this increase sticking."** (Id.)

Mr. Brand (L&W) rejected a regional sales manager's request for a lower bid, stating, "I'm sorry but we cannot accommodate this request. There have been many similar requests across the country and the company's decision is to not make any of these type[s] [of] exceptions to our price increase at the present time. The reason, it would show our competition that we are protecting work and that would have the potential to harm the chances of this increase sticking." (Pls. Supp.

---

[24] According to Defendants, earlier emails in this chain reflect that PABCO's "policy" is to not take on "new business until the needs of current customers [are] met" because this "endear[s] PABCO to current customers and [gives] competitor's customers the desire to join the PABCO team ASAP." (Defs. Resp. SOF ¶ 38) (citation omitted).)

[25] Defendants argue that Exhibits PP and QQ "at most, reflect that drywall manufacturers instituted the same policy of controlled distribution that they had done in advance of many prior price increases, in order to ensure that all customers received the wallboard they needed." (Defs. Resp. SOF ¶ 40.)

SOF ¶ 36; <u>id.</u> Ex. LL.)  Mr. Brand closed by writing, "Hold firm and keep me informed if you hear what the competition is doing in your markets."  (February 2016 MSJ Opinion at 88.)

15. **12/11/2012: Mr. Kohl (PABCO) sent an internal memo to Mr. Lucchetti (PABCO) regarding how to maintain increased prices.**

In a November 2012 "Market Condition Report," Mr. Kohl explained: "With the higher prices, we should expect to see a stronger presence of board from both American Gypsum and the Temple-Inland plants . . . in the West. As long as we all ignore American's and Inland's effort to take a small share, the price will hold."  (Pls. Supp. SOF ¶ 37; <u>id.</u> Ex. MM.) [26]

16. **1/9/2013: PABCO employees based in California rejected a request to "hold pricing" because of "the need to support the increase."**

At 7:58AM, Steve Benasso (Sales at PABCO), who was based in California, emailed Joe Burke (PABCO), and stated:

> After speaking with Mark we will not be able to hold any pricing for TFK due to the need to support the increase.  We also had a customer with a similar situation in San Francisco with over 3 million feet of board that we gave the same answer, if we were to start making moves now it would send mixed messages to the market that contractors would try to leverage with distributors and manufacturers.

(Pls. Supp. SOF ¶ 39; <u>id.</u> Ex. OO.)  At 4:09PM, Mr. Benasso forwarded the email to Mr. Burkhammer, who was also based in California, and wrote, "FYI…just in case Joe or Clint give you a call.  They wanted us to hold pricing on 150k feet for TFK and I said no."  (Pls. Supp. SOF Ex. OO.)

**III.  LEGAL STANDARD**

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[26] Defendants argue that this report only "reveals that American Gypsum and Temple Inland were increasing delivery of wallboard and attempting to recapture market share during the alleged conspiratorial period."  (Defs. Resp. SOF ¶ 37.)

matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. Under Federal Rule of Civil Procedure 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Id. at 255.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.

After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule, [] set forth specific facts showing a genuine issue for trial." Stell v. PMC Techs., Inc., No. 04-5739, 2006 WL 2540776, at *1 (E.D. Pa. Aug. 29, 2006) (Baylson, J.) (citing Fed. R. Civ. P. 56(e)); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (The nonmoving party "must do more than simply show that there is some metaphysical dispute as so the material facts."). Summary judgment is appropriate if the adverse party fails to rebut by making a factual showing "sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## IV. DISCUSSION

### A. Parties' Contentions

#### i. Defendants' Motion for Summary Judgment

Defendants contend that the law of the state where Plaintiffs' purchasing entities are located should apply to each of Plaintiffs' state antitrust claims under California choice-of-law principles and the United States Constitution. (MSJ at 22–23.) As to California choice-of-law principles, Defendants argue that California's three-step governmental interest analysis, which both parties agree is applicable, requires that the law of the state where each Plaintiff was headquartered during the relevant period should govern each claim.[27] In other words, Defendants contend that California law should only apply to claims arising from purchases made in California. Defendants reach the following conclusions at each step of the governmental interest analysis:

(1) Under the first step, Defendants contend, and Plaintiffs concede, that there are material differences between the antitrust laws of California, a repealer state, and the laws of non-repealer states. (Id. at 11, 15.) Defendants also argue that there are several material differences between the antitrust laws of California and other repealer states, including that many states prohibit Plaintiffs from recovering to the extent that they passed through any drywall overcharge to customers, that Plaintiffs lack antitrust standing in many states, and that the availability of both treble damages and pre-judgment interest varies state-to-state. (Id. at 16–17.)

(2) Under the second step, Defendants argue that each non-repealer state has a strong interest in applying local law to purchases made within its borders. (Id. at 12.) With respect to other repealer states, Defendants contend that California law recognizes that

---

[27] At oral argument, Defendants specifically argued that the laws of the states where the purchasing entities are headquartered govern for choice-of-law purposes. (Oral Arg. Tr. at 35:6–8.)

it would defeat the purpose of <u>Illinois Brick</u> to allow one state's law to replace the law of every state that permits indirect purchaser claims. (<u>Id.</u> at 17.)

(3) Finally, under the third step, Defendants argue that the interest of each state of purchase in applying local law outweighs California's interest. (<u>Id.</u> at 12–15, 18.)

Next, Defendants contend that nationwide applicable of California law would violate the Due Process and Commerce Clauses of the Constitution. Defendants argue that the Due Process Clause requires that the law of each state of purchase apply because California lacks significant contacts with purchases made in other states. (<u>Id.</u> at 19–20.) Defendants next argue that nationwide application of California law would violate the Commerce Clause by allowing Plaintiffs to recover for purchases made "wholly outside" of California's borders; namely, in states that have not repealed <u>Illinois Brick</u>. (<u>Id.</u> at 22.) As discussed in detail at oral argument, it is Defendants' position that if the Court determines that California law should not apply nationwide under California's governmental interest test, then the Court need not address Defendants' constitutional arguments. (<u>See</u> Oral Arg. Tr. at 31:11–22.)

### ii. Plaintiffs' Response

Plaintiffs, on the other hand, argue that the Court must consider whether application of California law satisfies due process before conducting a choice-of-law analysis. According to Plaintiffs, there is a presumption that California law applies nationwide under the Due Process Clause, and because Defendants have failed to meet their burden of overcoming that presumption, California law applies to all of Plaintiffs' state antitrust claims. (Resp. at 17–18.) Plaintiffs argue that Defendants have more than "de minimis" contacts with California, as required to satisfy due process. (<u>Id.</u> at 18 (citation omitted).) Plaintiffs also argue that Defendants engaged in a

nationwide conspiracy directed, at least in part, from California, and therefore, the application of California law does not violate the Commerce Clause. (Id. at 34–35.)

Plaintiffs then seek to refute Defendants' contention that California's three-step governmental interest analysis requires the application of the law of the state of purchase, as follows:

(1) Under the first step, Plaintiffs concede that there are material differences between the laws of repealer states, such as California, and non-repealer states. (Id. at 22–23.) However, Plaintiffs contend that Defendants cannot show that there are material differences between laws of California and other repealer states that would give rise to a "true conflict." (Id. at 23.)

(2) As to the second step, Plaintiffs argue that Defendants have failed to show that any non-repealer state has an interest in applying its laws to purchases within its borders. (Id. at 24.)

(3) Lastly, under the third step, Plaintiffs contend that Defendants have not demonstrated that non-repealer states' interests in applying their states' antitrust laws to this case trump California's interest. (Id. at 29.)

### iii. Defendants' Reply

In the Reply, Defendants reiterate their position that the law of the state of purchase applies to indirect purchaser claims in antitrust actions, such as this case. (Rep. at 1.) Defendants seek to undermine Plaintiffs' arguments that once due process is satisfied, the Court must presume that the law of the forum state (California) applies, and that Defendants have failed to meet their "substantial burden" to overcome that presumption. (Id.) Defendants argue that they have met this burden by demonstrating that California's choice-of-law rules require application of the law

of the state of purchase, not California law, to purchases made outside of California. (Id.) According to Defendants, under California's governmental interest test, the states of purchase have the greatest interests in applying their antitrust laws to this matter. (Id. at 1–2.)

Further, Defendants contend that even if California's choice-of-law rules permitted nationwide application of California law, application of California law would violate the Due Process Clause because California lacks "significant contact or significant aggregation of contacts" to Plaintiffs' claims. (Id. at 2.) Specifically, Defendants argue that Plaintiffs have manipulated the record to suggest that three of Defendants' regional employees who work in California–Mr. Brand (L&W), Mr. Burkhammer (PABCO), and Mr. Duval (PABCO)–were "ringleaders" of the conspiracy. (Id. at 13.) In reality, Defendants argue that the facts cited by Plaintiffs demonstrate that lawful "conscious parallelism," not illegal conspiratorial conduct, took place in California. (Id. at 15.)

### B. Analysis

#### i. Governing Law: Third Circuit Law Governs Issues of Federal Law, and California Law Governs the Choice-of-Law Analysis.

Plaintiffs originally filed their action in the Northern District of California, and the action was transferred to this Court on April 2, 2015 by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407. (ECF 1.) Throughout their briefing, both parties rely on Ninth Circuit law.

Before this Court addresses the challenges levied by Defendants, the Court must determine which law is binding and which is persuasive. As the Court has previously concluded, Third Circuit law is binding in this case on issues of federal law. (See Homebuilder MTD Opinion at 3–5); see also Oil Field Cases, 673 F. Supp. 2d 358, 362–63 (E.D. Pa. 2009) (Robreno, J.) ("In matters requiring the interpretation of the Constitution, a federal law or a federal rule of procedure, a

transferee court applies the law of the circuit where it sits. Therefore, in cases where jurisdiction is based on federal question, . . . the transferee court[] will apply federal law as interpreted by the Third Circuit."). Though this Court previously concluded that Third Circuit law is binding on issues of federal law in this action, the Court stated that it would "give special consideration to Ninth Circuit law in the Homebuilder action" and that the Court would "do its best to prevent a scenario in which the California district court [would] be bound by law that is contradictory to Ninth Circuit law" if the action were transferred back to the Northern District of California for trial. (Homebuilder MTD Opinion at 5.)

With respect to issues of state substantive law, including choice-of-law rules, California law is binding on this Court because this case was transferred from the district court in California under § 1407. See Marshall Invs. Corp. v. Krones A.G., 572 F. App'x 149, 152 n.4 (3d Cir. 2014) ("When a case is transferred under 28 U.S.C. § 1407 for consolidated pretrial proceedings, the transferee court must 'apply the same state substantive law, including choice-of-law rules, that would have been applied by a state court in the jurisdiction in which a case was filed.'") (citation omitted); see also In re Sony Gaming Networks & Customer Data Sec. Breach Litig., 996 F. Supp. 2d 942, 977 (S.D. Cal. 2014) ("[B]ecause the JPML transferred the instant litigation to this Court pursuant to 28 U.S.C. 1407, the Court must apply the choice-of-law rules of each state where the individual actions were originally filed."). In sum, Third Circuit law is binding, and Ninth Circuit law is persuasive, on this Court's assessment of constitutional issues. California law, as enumerated by the California Supreme Court and interpreted by the Ninth Circuit, is binding on this Court's choice-of-law analysis.

### ii. The Court Considers Defendants' Constitutional Arguments Before Conducting the Choice-of-Law Analysis.

As an initial matter, the parties dispute whether the Constitution provides an independent bar to the nationwide application of California law to Plaintiffs' state antitrust claims. Defendants contend that the Court need not address their constitutional arguments if the Court concludes, under California choice-of-law rules, that California law cannot apply nationwide. (See MSJ at 18; Oral Arg. Tr. at 31:11–22.) Plaintiffs, by contrast, argue that it is "widely recognized" that before the Court conducts a choice-of-law analysis, it must determine if Defendants have met their "substantial burden" to overcome the presumption that application of California law comports with due process. (Resp. at 1 (quoting Keilholtz v. Lennox Hearth Prods. Inc., 268 F.R.D. 330, 340 (N.D. Cal. 2010)).) Plaintiffs do not cite any judicial authority demonstrating that this proposition is "widely recognized." The parties also do not reference, nor is this Court aware of, any precedential, binding judicial decisions that address both constitutional and choice-of-law challenges to the application of state antitrust law.

Under California law, the Court must consider Defendants' due process challenges prior to conducting a choice-of-law analysis. The Ninth Circuit has stated, in the context of class certification, "[u]nder California's choice of law rules, the class action proponent bears the initial burden to show that California has 'significant contact or significant aggregation of contacts' to the claims of each class member." Mazza v. Am. Honda Motor Co., 666 F.3d 581, 589 (9th Cir. 2012) (quoting Wash. Mut. Bank v. Superior Court, 15 P.3d 1071, 1080 (Cal. 2001)); see also AT&T Mobility LLC v. AU Optronics Corp., 707 F.3d 1106, 1111 (9th Cir. 2013) ("The Due Process Clause . . . requires a court to invalidate the application of a state's law only where the state has 'no significant contact or significant aggregation of contacts, creating state interests, with

the parties and the occurrence or transaction.'" (quoting <u>Allstate Ins. Co. v. Hague</u>, 449 U.S. at 308, 320 (1981) (plurality opinion)).

After the proponent demonstrates that the requisite "significant contact or significant aggregation of contacts" exist, "the burden shifts to the other side to demonstrate 'that foreign law, rather than California law, should apply to class claims.'" <u>Mazza</u>, 666 F.3d at 589 (quoting <u>Wash. Mut. Bank</u>, 16 P.3d at 1081); <u>see also</u> <u>Pecover v. Elec. Arts Inc.</u>, No. C 08-2820 VRW, 2010 WL 8742757, at *17 (N.D. Cal. Dec. 21, 2010) ("If th[e] due process test is satisfied, the presumption under California choice-of-law rules is that California law applies . . . . The court first addresses the due process issue before considering whether [the defendant], which seeks application of foreign law to plaintiffs' claims, has met its burden under California law.") (citation omitted).

Following California federal and state jurisprudence, this Court first determines whether Plaintiffs have shown that application of California law to their state antitrust claims is constitutional. Second, this Court considers whether Defendants have demonstrated that the law of the state of purchase applies to Plaintiffs' state antitrust claims under California's choice-of-law rules.

> **1. Application of California Law Does Not Violate the Due Process Clause.**

The crux of the parties' due process dispute is whether application of California law to all of Plaintiffs' state law antitrust claims in Count III of the TAC violates the Due Process Clause of the Fourteenth Amendment, as interpreted by the Supreme Court in <u>Phillips Petroleum Co. v. Shutts</u>, 472 U.S. 797 (1985).

> **a. Relevant Law**

The Court previously directed the parties to "carefully consider [<u>Shutts</u>] when it comes time to address the consumer protection choice-of-law issues." (Homebuilder MTD Opinion at 12

n.11.)  Though the present Motion involves Plaintiffs' state antitrust claims, not its consumer protection claims, the Court considers Shutts in its Due Process analysis.  See AT&T Mobility, 707 F.3d at 1107 n.1 (stating that the Ninth Circuit's due process analysis with respect to the plaintiffs' claims under California's Cartwright Act "appl[ied] equally" to the plaintiffs' unfair competition claims).

Shutts stands for the proposition that a forum state's substantive law may apply to claims of a nationwide class under the Due Process Clause if the state has a "significant contact or significant aggregation of contacts" to the claims asserted by each class member.  See 472 U.S. at 821–22.  As Defendants point out, this Court stated in its opinion denying class certification to the indirect purchasers, "Under the Supreme Court's decision in Shutts . . ., this Court would likely be required to apply the laws of each individual state which creates each particular cause of action." (ECF 632 at 31.)[28]

However, the Court's note at the class certification stage does not end the Court's due process analysis on summary judgment, particularly because Defendants' due process rights are at issue in this individual action, unlike in Shutts, which involved the plaintiffs' rights in a class action.  See Bristol-Myers Squibb Co. v. Superior Court of Calif., 137 S.Ct. 1773, 1782–83 (2017) (cited by Defendants) (stating that Shutts, which "concerned the due process rights of plaintiffs," "ha[d] no bearing on the question" of whether the exercise of jurisdiction in California over non-resident plaintiffs' claims violated a non-resident defendant's due process rights).

Rather than rely on Shutts, Plaintiffs contend that the Ninth Circuit's opinion in AT&T Mobility permits this Court to apply California law to all of Plaintiffs' state antitrust claims.  (See TAC ¶ 273.)  In AT&T Mobility, direct and indirect purchasers of liquid crystal display ("LCD")

---

[28] This opinion is available on the MDL docket and at In re Domestic Drywall Antitrust Litig., No. 13-MD-2437, 2017 WL 3700999 (E.D. Pa. Aug. 24, 2017) (Baylson, J.).

panels alleged that the defendants, manufacturers and distributors of LCD panels, violated the Clayton Act, the Sherman Act, California's Cartwright Act, California's Unfair Competition Law, and, in the alternative, a number of other states' laws. 707 F.3d at 1108. The plaintiffs did business in California, but only one plaintiff's principal place of business was in California. Id. The defendants' principal places of business were located throughout Asia and United States, including in California. Id. Though none of the purchases at issue were made in California, the plaintiffs alleged that conspiratorial conduct took place in California, including that specific employees of particular defendants, operating in California offices, illegally obtained and shared co-conspirators' pricing information. Id. at 1109. The district court dismissed the plaintiffs' California law claims, concluding that the application of California law to claims involving purchases made outside of California violated the defendants' due process rights. Id.

On appeal, the Ninth Circuit reversed, rejecting the district court's focus on the place of purchase in its due process analysis. Id. at 1110, 1114. The Ninth Circuit held that anticompetitive conduct within a state that is related to a plaintiff's alleged injuries and is not "slight and casual" is sufficient to establish the "significant aggregation of contacts" necessary to satisfy due process. Id. at 1113. Specifically, the Ninth Circuit held that application of California's Cartwright Act did not violate the defendants' due process rights because more than a "de minimis" amount of the defendants' alleged conspiratorial conduct leading up the plaintiffs' purchases took place in California. Id.

In its analysis, the Ninth Circuit applied the Supreme Court's plurality opinion in Allstate, which imposed "modest restrictions on the application of forum law." Shutts, 427 U.S. at 818 (citing Allstate, 449 U.S. at 312–13). In Allstate, the Supreme Court upheld the application of Minnesota insurance law even though the insurance policy at issue was delivered in Wisconsin,

the automobile accident took place in Wisconsin, and all persons involved were Wisconsin residents at the time of the accident. 449 U.S. at 302. The decedent, who had lived in Wisconsin, had been employed in Minnesota. Id. After the accident, the decedent's wife moved to Minnesota and brought an action against the insurer, Allstate, seeking a declaration that Minnesota law applied to the insurance policy. Id. at 305–06. The Supreme Court held that Minnesota had a "significant aggregation of contacts" with the parties and the accident because the decedent was employed in Minnesota, Allstate was at all times present and doing business in Minnesota, and the decedent's wife became a Minnesota resident before initiating litigation. Id. at 313–20.

When applying Allstate, the Ninth Circuit in AT&T Mobility explained that unlike in Allstate, where neither the delivery of the insurance policy nor the automobile accident took place in Minnesota, in AT&T Mobility, the plaintiffs alleged that "some portion of Defendants' alleged illegal price-fixing conduct took place in California." 707 F.3d at 1111. Accordingly, the Ninth Circuit stated, "Wherever the outer limit of due process constraints may lie, it is clear to us that Defendants' alleged illegal activity within California created more significant contacts with California than the contacts described in Allstate created with Minnesota." Id.

### b. Application

Defendants argue that Plaintiffs' reliance on AT&T Mobility is misplaced because "[c]ases in the Third Circuit hold that even if a product is manufactured in one state by a resident defendant, when the purchase occurs outside [of] that state, its law cannot be applied consistent[ly] with Due Process." (MSJ at 20.) Though Defendants are correct that the Third Circuit's interpretation of the Due Process Clause is binding on this Court, Defendants do not cite, nor has this Court located, any Supreme Court or precedential Third Circuit opinions rejecting AT&T Mobility or holding

that the place of purchase exclusively governs for purposes of due process in the antitrust context.[29] As the Court has previously stated that it would give "special consideration" to Ninth Circuit law, the Court finds AT&T Mobility instructive. Further, because there is no dispute that this Court is bound by Supreme Court precedent, the Supreme Court's opinion in Allstate is also particularly helpful.

Defendants contend that even if AT&T Mobility were binding on this Court, Plaintiffs have failed to demonstrate that Defendants' conduct in California amounted to more than de minimis contacts with California. (MSJ at 20–21.) Put another way, Defendants argue that Plaintiffs' state antitrust claims lack "significant contact or significant aggregation of contacts" with California, as required to satisfy due process. (See Rep. at 13–17.) The Court disagrees.

The record reflects that California has a "significant aggregation of contacts" with Plaintiffs' state antitrust claims. Unlike in Allstate, where Minnesota law applied even though the individuals involved in the accident were not residents of Minnesota, the delivery of the insurance policy did not take place in Minnesota, and the accident did not occur in Minnesota, here, it is undisputed that during the relevant period, three Plaintiffs were headquartered in California, one Defendant was headquartered in California, and some portion Plaintiffs' purchasing entities headquartered in California purchased drywall. (See Pls. Supp. SOF ¶¶ 48–53.) Further, as the record evidence shows that the "alleged conspiracy took place, at least in part, in California[,]"

---

[29] Defendants also argue the AT&T Mobility is of "minimal value" because it preceded the Supreme Court's decision in Bristol-Myers Squibb Co., which "re-emphasized" the "theme" that a state that permits indirect purchasers to recover for purchases made within the state cannot dictate recovery for purchases made in other states. (MSJ at 19–20.) The Court is not persuaded by Defendants' attempt to draw connections between Bristol-Myers Squibb Co. and the instant case. Bristol-Myers Squibb Co., which involved a state's exercise of personal jurisdiction over an out-of-state defendant, is factually inapposite to this case, which involves the application of a state's substantive law to out-of-state plaintiffs. Further, Bristol-Myers Squibb Co. does not affect the Court's choice-of-law analysis because, as the Supreme Court recognized in Shutts, "[t]he issue of personal jurisdiction over plaintiffs in a class action is entirely different from the question of the constitutional limitations on choice of law." Shutts, 472 U.S. at 821.

Defendants "cannot reasonably complain that the application of California law is arbitrary or unfair[.]" See AT&T Mobility, 707 F.3d at 1113. Moreover, PABCO and USG were doing business in California during the relevant time period, as it is undisputed that they have had a business presence in California for nearly fifty years. See Shutts, 472 U.S. at 822 ("When considering fairness in this context, an important element is the expectation of the parties."); Allstate, 449 U.S. at 317–18 ("By virtue of its presence [in Minnesota], Allstate can hardly claim unfamiliarity with the laws of the host jurisdiction and surprise that the . . . courts might apply forum law to litigation in which the company is involved.").

While Defendants argue that Plaintiffs have cherry-picked from the 663 relevant facts identified by the class plaintiffs to manufacture a significant contact with California, the record reflects that "some portion" of Defendants' alleged conspiratorial conduct took place in California during the relevant time period. See AT&T Mobility, 707 F.3d at 1111. As the parties' contacts with California exceed those in Allstate, the Court need not reach any conclusions as to whether the facts cited amount to unlawful conspiratorial conduct to conclude that application of California law comports with the "modest restrictions" imposed by the Due Process Clause. See Shutts, 472 U.S. at 818.

### 2. Application of California Law Does Not Violate the Commerce Clause.

Defendants further argue that application of California law violates the Commerce Clause of the Constitution, which "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects with the State." (MSJ at 21 (quoting Healy v. Beer Inst., Inc., 491 U.S. 324, 336–40 (1989)).)

In Healy, an association of brewers and importers of beer sought declaratory judgment that a Connecticut statute violated the Commerce Clause. Id. at 326. The statute required out-of-state

shippers of beer to affirm that their prices for beer sold to Connecticut wholesalers were no higher than prices in bordering states. Id. The Supreme Court held that the Connecticut statute violated the Commerce Clause because the interaction of the Connecticut statute with beer-pricing statutes of bordering states had the "practical effect" of controlling prices "wholly outside" of Connecticut's borders. Id. at 336–37.

Plaintiffs contend that Defendants "stretch Healy beyond its breaking point," and the Court agrees. (See Resp. at 34.) Unlike in Healy, where the plaintiff challenged the constitutionality of a state statute that regulated out-of-state conduct, in this case, Defendants challenge the application of a state law to out-of-state plaintiffs. Defendants are not arguing that California's Cartwright Act is unconstitutional. Further, whereas in Healy, where the statute at issue regulated prices "wholly outside" of the state's borders, here, it is undisputed that Plaintiffs and/or their purchasing entities headquartered in California purchased wallboard during the relevant time period.

In support of their position, Defendants cite only one Third Circuit decision: A.S. Goldmen & Co. v. New Jersey Bureau of Securities, 163 F.3d 780 (3d Cir. 1999). (See MSJ at 22; Rep. at 12 n.5.) Defendants' reliance on this factually inapposite case is misplaced. A.S. Goldmen, similar to Healy, involved an action for declaratory judgment to invalidate a state law. 163 F.3d at 781, 789. A.S. Goldmen also fails to demonstrate, as Defendants posit, that Commerce Clause jurisprudence is applicable to this Court's choice-of-law analysis. In fact, the only mention of choice-of-law in A.S. Goldmen is in Judge McKee's dissent, which underscores the distinction between a challenge to a state law as violating the Commerce Clause and a challenge to the application of a forum state's law under choice-of-law principles. See id. at 790 (McKee, J., dissenting) ("The approach the majority uses would be helpful to resolving a choice of law dispute, but it is only of limited assistance in adjudicating under the Commerce Clause.").

In sum, Plaintiffs have shown that application of California law to Plaintiffs' state antitrust claims violates the Commerce Clause, and Defendants have failed to support a finding to the contrary. Therefore, the Court proceeds to determine whether Defendants have met their burden of demonstrating that the laws of the states of purchase should apply to this matter under California's choice-of-law rules.

### iii.  Choice-of-Law Analysis

As noted above, the parties dispute whether the law of each state of purchase should apply to purchases made outside of California pursuant to California's choice-of-law rules. Even where California law may be constitutionally applied, "California follows a three-step 'governmental interest analysis' to . . . ascertain the most appropriate law applicable to the issues where there is no effective choice-of-law agreement." Wash. Mut. Bank, 15 P.3d at 1080; see also Paulsen v. CNF, Inc., 559 F.3d 1061, 1080 (9th Cir. 2009) ("California will apply its own rule of decision unless a party invokes a law of a foreign state that 'will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it.'" (quoting Hurtado v. Superior Court, 522 P.2d 666, 670 (Cal. 1974))). California's "governmental interest analysis" involves three steps.

Under the first step, "the foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California." Wash. Mut. Bank, 15 P.3d at 1080. "If . . . the trial court finds the laws are materially different, it must proceed to the second step and determine what interest, if any, each state has in having its own law applied to the case." Id. at 1080–81. "Only if the trial court determines that the laws are materially different and that each state has an interest in having its own law applied, thus reflecting an actual conflict, must the court take the final step and select the laws of the state whose interests

would be 'more impaired' if its law were not applied." Id. at 1081 (citation omitted). In the third

step, "the trial court must determine 'the relative commitment of the respective states to the laws

involved' and consider 'the history and current status of the states' laws' and 'the function and

purpose of those laws.'" Id. (citation omitted).

### 1. Step One: Whether California Law Materially Differs from the Laws of Each "Potentially Concerned State"

Differences between California law and foreign law are "material" "when they 'spell the

difference between the success and failure of a claim' or determine availability of remedies." Van

Mourik v. Big Heart Pet Brands, Inc., No. 3:17-cv-03889-JD, 2018 WL 1116715, at *3 (N.D. Cal.

Mar. 1, 2018) (quoting Mazza, 666 F.3d at 591) (concluding that the differences between Texas

consumer protection law, which did not target unfair conduct and permitted only economic and

treble damages, and California law, which prohibited unfair conduct and provided for actual

damages, injunctive relief, restitution, punitive damages, and other relief, were material); see also

Mazza, 666 F.3d at 591–92 ("'Any differences in [the states'] laws must have a significant effect

on the outcome of trial in order to present an actual conflict in terms of choice of law.'" (alteration

in original) (quoting In re Complaint of Bankers Trust Co., 752 F.2d 874, 882 (3d Cir. 1984))).

The parties do not dispute that there are material differences between the antitrust laws of

California, a repealer state, and the laws of non-repealer states. (See MSJ at 11; Resp. at 22); see

also In re Packaged Seafood Prods. Antitrust Litig., 242 F. Supp. 3d 1033, 1066–67 (S.D. Cal.

2017) (identifying the availability of indirect purchaser recovery as a material difference creating

a true conflict between the laws of repealer and non-repealer states); In re Qualcomm Antitrust

Litig., 292 F. Supp. 3d 948, 979 (N.D. Cal. 2017) (concluding that the differences between

California's Cartwright Act and the antitrust statutes of states that did not allow damages suits by

indirect purchasers suits were material); In re TFT-LCD (Flat Panel) Antitrust Litig., No. 10-05625

SI, 2013 WL 6327490, at *3 (N.D. Cal. Dec. 3, 2013) (hereinafter, "TFT-LCD (Flat Panel) II") (noting, on partial summary judgment on choice-of-law grounds, that the parties did not dispute that the law of Virginia, a non-repealer state, was "materially different from California or Illinois law with respect to indirect purchaser actions").

Defendants also contend that there are four material differences between the antitrust laws of California and other repealer states. First, Defendants contend that unlike California, "many" repealer states, including New Mexico, Illinois, and Minnesota, prohibit Plaintiffs from recovering for wallboard overcharges passed to their customers. (MSJ at 16.)[30] Second, Defendants argue that Plaintiffs "may not" have antitrust standing under the laws of many states because they have failed to provide "reliable evidence" of whom they purchased from, the amount of wallboard purchased, the percentage of turnkey purchases allocated to wallboard, and the amounts of overcharges. (Id.) Third, Defendants argue that treble damages are unavailable in "at least" Florida and New Mexico, and they are limited in Arizona. (Id. at 17.) Finally, Defendant contends that the availability of pre-judgment interest varies state-to-state. For example, whereas pre-judgment interest is available in California upon a showing of bad faith, Arizona may allow for pre-judgment interest on liquidated damages, and Nevada does not consider whether the judgment is for a liquidated or unliquidated sum in awarding pre-judgment interest. (Id.) Defendants do not cite any binding judicial authority indicating that these differences are "material."

While Defendants have identified differences between California law and the laws of a few other repealer states, as Plaintiffs note, Defendants do not explain how these differences are "material" to Plaintiffs' state antitrust claims. Without any analysis, the Court cannot conclude that Defendants have demonstrated that a true conflict would exist if California law were applied

---

[30] Defendants contend that the availability of the pass-through defense is a material difference between California and other repealer states even though they dispute that California prohibits this defense. (Id.)

to claims arising from purchases in other repealer states.  Cf. Mazza, 666 F.3d at 591 (holding that "at least some differences" identified by the defendant, the foreign law proponent, were material where the defendant "exhaustively detailed the ways in which California law differ[ed] from the laws of the 43 other jurisdictions in which class members reside[d]").

The Court also notes that in the class certification context, judges in the Northern District of California have certified classes in repealer states under the Cartwright Act after applying California's governmental interest analysis.  See, e.g., In re Korean Ramen Antitrust Litig., No. 13-cv-04115-WHO, 2017 WL 235052, at *22 (N.D. Cal. Jan. 19, 2017); In re Optical Disk Drive Antitrust Litig., No. 3:10-md-2143 RS, 2016 WL 467444, at *14 (N.D. Cal. Feb. 8, 2016), appeal filed, No. 19-15538 (9th Cir. Mar. 25, 2019).

As the Court concludes that Defendants have failed to meet their burden of demonstrating that the antitrust laws of California and other repealer states are materially different, the Court need not proceed to the second step of the governmental interest analysis as to repealer states.  See In re Hyundai & Kia Fuel Econ. Litig., 926 F.3d 539, 562 (9th Cir. 2019) (en banc) ("If the [foreign law proponents] fail to meet their burden at any step in the [choice-of-law] analysis, the district court 'may properly find California law applicable without proceeding' to the rest of the analysis." (quoting Pokorny v. Quixtar, Inc., 601 F.3d 987, 995 (9th Cir. 2010)).  Therefore, the Court concludes that California law will govern as to state antitrust claims made by Plaintiffs who were headquartered in repealer states during the relevant period.  The Court turns to the second step of the governmental interest analysis to assess the interests of only the non-repealer states.

### 2.  Step Two: Each State's Interest in Having its Own Law Applied

In step two, "the court must determine whether a true conflict exists; that is, whether both states have a legitimate interest in having their state law applied to the case."  TFT-LCD (Flat

Panel) II, 2013 WL 6327490, at *3.  Defendants argue that each state of purchase has a legitimate

interest in applying its own law to commercial activity within its borders.  (See MSJ at 11–12.)

"The second step of the governmental interest analysis requires [this Court] to examine

each jurisdiction's interest in the application of its own law in the circumstances of the particular

case to determine whether a true conflict exists."  McCann v. Foster Wheeler LLC, 225 P.3d 516,

529 (Cal. 2010) (citation and internal quotation marks omitted).  The Ninth Circuit has stated that

"every state has an interest in having its law applied to its resident claimants."  Mazza, 666 F.3d

at 591–92 (quoting Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1187 (9th Cir. 2001)).

"California law also acknowledges that 'a jurisdiction has 'the predominant interest' in regulating

conduct that occurs within its borders[.]'"  Mazza, 666 F.3d at 592 (quoting McCann, 225 P.3d at

516); see, e.g. TFT-LCD (Flat Panel) II, 2013 WL 6327490, at *3 (denying motion for summary

judgment on choice-of-law as to claims under the Cartwright Act after considering, in detail,

California and Virginia's interest in applying their antitrust laws to the matter).

California has a well-documented, articulated interest in applying the Cartwright Act.  See

TFT-LCD (Flat Panel) II, 2013 WL 6327490, at *4 ("California has repeatedly demonstrated its

commitment to the application and enforcement of the Cartwright Act. . . .  The California Supreme

Court has held that the purposes of the Cartwright Act are better served by overcompensating

plaintiffs than by failing to adequately deter anticompetitive behavior." (citing Clayworth v. Pfizer,

233 P.2d 1066, 1081, 1083 (Cal. 2010))).  The Cartwright Act's objectives include "deterrence

and full disgorgement of ill-gotten gains, especially in the context of price fixing cartels; that

deterrence and full disgorgement include[] extending state-created remedies to out-of-state parties

harmed by wrongful conduct occurring in California."  In re TFT-LCD (Flat Panel) Antitrust Litig.,

No. 10-cv-4945, 2013 WL 4175253, at *2 (N.D. Cal. July 11, 2013) (hereinafter "TFT-LCD (Flat

Panel) I"); see also AT&T Mobility, 707 F.3d at 1112–13 ("Applying California law to anticompetitive conduct undertaken within California advances the Cartwright Act's 'overarching goals of maximizing effective deterrence of antitrust violations, enforcing the state's antitrust laws against those violations that do occur, and ensuring disgorgement of any ill-gotten proceeds'" (quoting Clayworth, 233 P.3d at 1070)).

In contrast, there is disagreement amongst district judges in California regarding whether non-repealer states are interested in denying their citizens recovery for antitrust violations committed by out-of-state defendants. Compare Korean Ramen, 2017 WL 235052, at *22 (certifying a class of indirect purchasers under the Cartwright Act only in repealer states, not in non-repealer states, because "'[g]iven that the action simply could not go forward in non-repealer states, . . . it is too much of a stretch to employ California law as an end run around the limitations those states have elected to impose on standing'") (alteration in original) (citation omitted), and TFT-LCD (Flat Panel) I, 2013 WL 4175253, at *2 (on a motion in limine to determine whether California or Texas law applied to indirect purchasers' claims, disagreeing with the plaintiffs' argument that Texas, a non-repealer state, had no interest in ensuring that out-of-state defendants were shielded from damages for antitrust violations) (citing Mazza, 666 F.3d at 592–93), and TFT-LCD (Flat Panel) II, 2013 WL 6327490, at *3 (on a motion for partial summary judgment on choice-of-law, concluding that Virginia, a non-repealer state, had an interest in the application of its antitrust law where some of the impact of the alleged price fixing took place at the plaintiff's headquarters in Virginia, from which it placed purchased orders and generated payments), with Qualcomm, 292 F. Supp. 3d at 979–80 (where the sole defendant was a resident of California, a repealer state, the court concluded that applying non-repealer states' antitrust laws to bar recovery

"would paradoxically disadvantage the other states' own citizens for injuries caused by a California defendant's unlawful activities that took place primarily in California").

Here, Defendants, without discussing the interests of specific non-repealer states, argue that states of purchase have legitimate interests in regulating commercial activities within their borders. Defendants' analysis cites only one precedential judicial decision in the Ninth Circuit, Mazza, and, in a conclusory fashion, contends that non-repealer states have interests in prohibiting antitrust suits arising from indirect purchases. (See Rep. at 4–6.) That is not sufficient for Defendants to satisfy their burden of demonstrating that a "true conflict" exists, as Defendants have failed to show that "each state has an interest in the application of its own law to 'the circumstances of the particular case[.]'" Hyundai & Kia Fuel Econ. Litig., 926 F.3d at 562 (quoting Kearney v. Salomon Smith Barney, Inc., 137 P.3d 914, 922 (Cal. 2006)).

Though it is Defendants burden to demonstrate that there is a "true conflict," the Court also considers Plaintiffs' argument that no "true conflict" exists. According to Plaintiffs, non-repealer states have no interest in preventing indirect purchasers from recovering from Defendants, corporate citizens of repealer states. (See Resp. at 23–29.) In support of this position, Plaintiffs rely almost exclusively on Qualcomm. As Defendants note, the choice-of-law analysis in a subsequent opinion in the Qualcomm matter is currently on appeal to the Ninth Circuit. See Qualcomm, 292 F. Supp. 3d at 979–81 (cited by Plaintiffs) (denying the defendant's motion to strike indirect purchasers' nationwide class allegations under the Cartwright Act because non-repealer states had no interest in preventing their citizens from recovering for antitrust violations committed by a corporation in California, a repealer state); In re Qualcomm Antitrust Litig., 328 F.R.D. 280, 313–15 (N.D. Cal. 2018) (not cited by Plaintiffs) (applying the same choice-of-law analysis when granting the plaintiffs' motion for class certification), appeal filed sub nom.

Stromberg v. Qualcomm Inc., No. 18-80135 (9th Cir. Oct. 11, 2018). Further, the only federal judicial decision cited by Defendants that applied Mazza in the context of a motion for summary judgment in an antitrust action, TFT-LCD (Flat Panel) II, took a contrary position to Qualcomm. See 2013 WL 6327490, at *3–4 (concluding that both California and Virginia, a non-repealer state, had an interest in the application of its antitrust law to the matter).

Though the Court is not inclined to postpone ruling on Defendants' Motion until the Ninth Circuit issues an opinion in Qualcomm, the Court cannot conclude, as a matter of law, that California law applies to state antitrust claims brought by Plaintiffs located in non-repealer states based on the current record. Cf. Forcellati v. Hyland's, Inc., No. 12-1983-GHK (MRWx), 2014 WL 1410264, at *4 (C.D. Cal. Apr. 9, 2014) (concluding that California law applied to the plaintiffs' proposed nationwide class "because [the] [p]laintiffs [ ] made a sufficient initial showing for application of California law, and [the] [d]efendants have failed to show otherwise").

In short, the parties have not adequately briefed the interests of non-repealer states in which Plaintiffs were headquartered, as required for the Court to draw any conclusions about the existence of a "true conflict." Therefore, the Court will require counsel for Plaintiffs and Defendants to confer as to future briefing on this issue, particularly in light of the Ninth Circuit's recent en banc ruling in Hyundai & Kia Fuel Economy Litigation, 926 F.3d 539. See id. at 562 n.6 (noting that a district court is not obligated to conduct a "comprehensive survey of every state's law" when the foreign law proponent has failed to do so) (citation and internal quotation marks omitted). Within ten (10) days, counsel shall file either a joint statement or individual statements, limited to five (5) pages, addressing whether supplemental briefing will be required. Any supplemental briefing must be filed by August 15, 2019 and is limited to twenty (20) pages.

As Defendants have not met their burden as to the second step of the governmental interest analysis, the Court need not proceed to the third step.  See Hyundai & Kia Fuel Econ. Litig., 926 F.3d at 562 ("If the [foreign law proponents] fail to meet their burden at any step in the [choice-of-law] analysis, the district court 'may properly find California law applicable without proceeding' to the rest of the analysis.")  (citation omitted).  Though the Court does not reach the third step, the Court notes that if the parties submit supplemental briefing, the briefs must address the degree to which non-repealer states' interests would be impaired by application of California law to Plaintiffs' state antitrust claims.  In the absence of such briefing, the Court would be unable to "carefully evaluate[] and compare[] the nature and strength of the interest of each jurisdiction in the application of its own law," as the third step of California's governmental interest analysis requires.  See McCann, 225 P.3d at 527.

## V.     Conclusion

For the foregoing reasons, Defendants' Motion will be denied as to repealer states. California law will apply to state antitrust claims in Count III brought by Plaintiffs located in repealer states.  As to non-repealer states, the Court withholds judgment pending resolution by the parties or, if necessary, the Court's review of supplemental briefing.

O:\CIVIL 15\15-1712 ashton woods v. usg\15cv1712 Memo re MSJ CoL.docx