**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: DOMESTIC DRYWALL ANTITRUST LITIGATION** | **CIVIL ACTION** |
| **THIS DOCUMENT RELATES TO:** | **MDL No. 13-2437** |
| **Ashton Woods Holdings LLC, et al., Plaintiffs,** | **15-cv-1712** |
| **v.** | |
| **USG Corp., et al., Defendants.** | |

<u>**MEMORANDUM RE: USG DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

Baylson, J.                                                                                          July _19, 2019

## I.        Introduction

Before the Court is the summary judgment motion of three defendants—USG

Corporation, United States Gypsum Company, and L&W Supply Corporation (collectively the

"USG Defendants"). In this multidistrict litigation involving the alleged price fixing of gypsum

wallboard (drywall), the Court has, in a related class action, addressed summary judgment

motions of other defendant wallboard manufacturers alleged to be part of the same price-fixing

conspiracy as the USG Defendants. (<u>See</u> 13-MD-2437, ECF 351) ("Mem. Op.") At that time,

however, the USG Defendants had settled with the class plaintiffs. Therefore, its participation, or

lack thereof, in the alleged price-fixing conspiracy was not subject to analysis by the Court.

For the reasons that follow, the USG Defendants' Motion for Summary Judgment will be

granted in part and denied in part.

## II.    BACKGROUND

### A.    Procedural history

This motion arises in an action by twelve large homebuilders ("Homebuilder Plaintiffs" or "Plaintiffs") against seven defendants for violations of the Sherman Act. There are currently four remaining defendants—USG Corporation, United States Gypsum Company, L&W Supply Corporation (collectively "USG Defendants" or "Defendants") and PABCO Building Products LLC.[1]

As the Court mentioned in the Choice of Law summary judgment opinion, this case, and the related class actions, have an extensive history that is not recounted again here. (See Choice-of-law Mem. Op., ECF 390.) The Court does, however, recount the relevant portions of the procedural history.

 In February 2016, this Court addressed some of the defendants' summary judgment motions, denying the motions of defendants American, National, Lafarge, and PABCO, and granting the motion of defendant CertainTeed. (Mem. Op.) At that point, the USG Defendants had settled with the class Plaintiffs, and thus the Court did not consider traditional conspiracy evidence involving them. (Id. at 146, n. 70.)

The USG Defendants filed a motion for summary judgment in the homebuilder action on May 31, 2018. (Mot., ECF 304.) Plaintiffs filed a Motion to Strike on June 25, 2018 (ECF 310), contending that USG was central to the Court's 2016 summary judgment opinion. The USG Defendants responded to Plaintiffs' Motion to Strike, asserting that it had "never had the chance to challenge the evidence against it under the summary judgment standard." (ECF 327 at 1.) On

---

[1] The Court has recently recounted the procedural history of this case, specifically explaining the settlements and dismissals of the other defendants, in detail in our July 8, 2019 Memorandum on Motion for Summary Judgment on Choice of Law. (ECF 390 at 3-5.)

October 11, 2018, the Court denied Plaintiffs' Motion to Strike, and ordered that Plaintiffs respond to the USG Defendants' Motion for Summary judgment. (ECF 356.) Plaintiffs did so on November 9, 2018. (ECF 357-359.) The USG Defendants replied on December 3, 2018. (Reply, ECF 363-366.)

On January 17, 2019, the Court sent the parties a proposed factual chronology which was an attempt "to fairly and accurately input all of the relevant facts asserted by both parties in their recent submissions." (ECF 371.) In accordance with that Order, both parties submitted suggested modifications to the chronology on February 7, 2019. (ECF 373 & 374.)

The Court held oral argument on March 12, 2019 on the USG Defendants' motion and other pending motions for summary judgment. Following oral argument, on April 12, 2019, both parties submitted supplemental briefs addressing issues raised during oral argument, and responded to each other's suggested modifications to the factual chronology. (Pl. Suppl. Br., ECF 384; Def. Suppl. Br., ECF 383.)

### B. Undisputed Factual Chronology

#### 1. The USG Defendants

USG Corporation ("USG Corp.") is a holding company that conducts business through its subsidiaries, including United States Gypsum ("Gypsum")[2] and L&W Supply Corporation ("L&W"). (Third Am. Compl. ("TAC"), ECF 110 at ¶ 43.)

---

[2] The parties call United States Gypsum Company "USG" in the briefs, a term the Court has used in prior opinions. In the context of this motion, however, the Court finds this term confusing, and thus use the name "Gypsum" instead. The Court substitutes the name of the company when quoting the filings and record.

Gypsum, a wholly-owned and controlled subsidiary of USG Corp., manufactures and sells gypsum wallboard. (Id. at ¶ 44.) Plaintiffs assert that in 2011, "approximately 25% of U.S. gypsum wallboard sales were made by [Gypsum]." (Id.)

L&W, which was a wholly-owned and controlled subsidiary of USG Corp. during the relevant time period, is a building materials distributor. (Id. at ¶ 45.) Plaintiffs assert that L&W is "one of the only wallboard dealers with a national presence" and that it "sold about 8% of all wallboard in the United States" in 2011. (Id.) At least two of the Homebuilder Plaintiffs alleged that they bought drywall directly from L&W. (Id. at ¶¶ 31 & 34.) L&W purchased 90% of its drywall from Gypsum, 6% from PABCO, and 4% from American. (Def. Suppl. Br. at 5-6; Pl. Suppl. Br. at 3; Ex. 1133, Waterhouse Dep. 22:18-23:21.)

During oral argument, when the Court asked counsel to characterize the relationship between Gypsum and L&W, counsel for USG Defendants explained that Gypsum and L&W are manufacturer and distributor, and that a similar relationship exists between L&W and American or PABCO. (3/12/19 Hearing Tr., ECF 391 at 107:20-25.)[3] Gypsum "rarely, but sometimes sells [drywall] directly to home builders," and "sells primarily to for instance distributors. . . . It's the distributors that mostly dealt with job quotes." (Id. at 108:15-20.) Defendants' counsel also stated that "a big part of [Gypsum's] sales go to what are called big box retailers like Home Depot, Lowes." (Id. at 108:21-23.) Counsel did not know whether L&W also sold to big box retailers. (Id. at 112:20-113:5.)

When Gypsum sells drywall to L&W, the sale is subject to a purchase agreement. (Id. at 111:6-10.) The USG Defendants' counsel did not respond to the Court's question about whether

---

[3] Plaintiffs' counsel did not dispute Defendants' characteristics of the relationship between the two companies. (3/12/19 Hearing Tr. 116:11-118:7.)

Gypsum and L&W use transfer pricing, because she did not "think it's relevant in the sense that L&W operates independently. And like any other distributor that purchases from [Gypsum]." (Id. at 109:19-25.) According to Defendants, Gypsum did not give L&W preferential pricing but rather "sold to L&W the same way it set the prices for drywall it sold to other distributors." (Def. Suppl. Br. at 6) (citing Griffin Dep. at 32:14-34:7.) L&W then sells the drywall it obtains from Gypsum and others to "builders, end users, and other parties." (Def. Suppl. Br. at 5-6.) In addition to drywall, L&W sells ceiling and steel products. (Id. at 6.)

## 2. Factual chronology relating to alleged conspiratorial conduct[4]

The following chronology of material facts is taken from the Court's previous summary judgment opinion and the statements of facts submitted by the parties in briefing this motion. The Court has considered the suggested modifications to this chronology submitted by each party (ECF 373 & 374) as well as the responses to those suggested modifications on the supplemental briefs filed after oral argument.

### 1. Executives from L&W and Gypsum served on USG Corp.'s Executive Committee.

Brendan Deely, L&W's President and CEO was also a Senior Vice President of USG Corp. between February 2010 and January 2013 and reported directly to Jim Metcalf, Chairman, President, and CEO of USG Corp. (SOF ¶ 68; Ex. 1225.) In that role, Mr. Deely was a member of USG Corp.'s Executive Committee, along with, among others, Messrs. Griffin (President of

---

[4] The Court will occasionally reference paragraphs from the Class Plaintiffs' Statement of Facts ("SOF") (13-MD-2437, ECF 250) and the Defendants' Statement of Facts ("Class DSOF") (13-MD-2437, ECF 211) from the class action and exhibits filed in support of the earlier motion ("Ex."). The Court will also reference USG Defendants' and Homebuilder Plaintiffs' Supplemental Exhibits ("Suppl. Ex."), or as the Homebuilder Plaintiffs' or USG Defendants' Statement of Material Facts ("PSOF" or "DSOF") rather than citing to the underlying exhibits. The Court is not relying on the statements of facts as evidence; it is using the reference merely as shorthand to refer to the exhibits listed in the statement of facts' paragraphs.

Gypsum and Executive Vice President of USG Corp.) and Metcalf. (<u>Id</u>.) Mr. Deely attended all but one of USG Corp.'s board of directors meetings, including meetings at which five-year strategic plans for both Gypsum and L&W were discussed and meetings at which the next year's goals for both Gypsum and L&W were discussed. (<u>Id</u>.) Each year in June, Gypsum's strategic plan was presented to members of USG Corp.'s Executive Committee, which includes Jim Metcalf and Mr. Deely. (SOF ¶ 68; Ex. 1133, Waterhouse Dep. at 189:8-191:14; Ex. 1226.) In addition to Mr. Deely, many of L&W's officers, including Stanley Ferguson, Matthew Hilzinger, Rick Lowes, Christopher Rosenthal, and Ken Banas, were also officers of USG Corp. and L&W's directors (Deely, Ferguson, and Hilzinger) were officers of USG Corp. as well. (SOF ¶ 68; Ex. 1158; Ex. 1100, Courtney Dep. 136:3-137:22; Ex. 1227.)

## 2. There was direct and regular contact between L&W and Gypsum employees

Brendan Deely, President and CEO of L&W and Senior Vice President of USG Corp., had a "friendly, communicative relationship" with Chris Griffin, President of Gypsum and Executive Vice President of Operations of USG Corp., and spoke with Mr. Griffin on a regular basis between 2010 and 2013. (SOF ¶ 67; Ex. 1225; Ex. 1108, Griffin Dep. at 134:16–135:22.)

Rob Waterhouse, L&W's Senior Vice President of Sales and Operations between 2010 and January 2013, met with Greg Salah, his "counterpart at [Gypsum]," "[o]nce every one to two weeks." (Ex. 1133, Waterhouse Dep. at 28:1–8.) He also had contact with Jim Metcalf, Chairman, President, and CEO of USG Corp., including having "lunch or a breakfast three to four times a year." (SOF ¶ 67; Ex. 1133, Waterhouse Dep. at 29:21–30:1; Ex. 1130, Salah Dep. at 65:3–11.)

## 3. Messrs. Metcalf, Griffin, Salah, Deely, and Waterhouse, along with other top USG Corp., Gypsum, and L&W executives all worked out of the same location. (<u>See</u>, <u>e.g.</u>, SOF ¶ 68; Ex. 1133, Waterhouse Dep. at 28:22–29:4; Ex. 1130, Salah Dep. at 47:9– 22; Ex. 1097, Chapa Dep. at 96:11–22.)

4. **USG Corp., Gypsum, and L&W share in-house legal, accounting, finance, and human resources teams. (SOF ¶ 69; Ex. 1097; Ex. 1225.)**

5. **L&W was directed by USG Corp. to purchase the large majority of its wallboard from Gypsum and to support Gypsum's facilities. (SOF ¶ 70; Ex. 1108, Griffin Dep. at 99:1–13.)**

6. **February 2010: Gypsum instituted a controlled distribution plan[5] in advance of a price increase scheduled for March 2010, which ultimately failed. (SOF ¶ 443; Suppl. Ex. 20.)**

Gypsum again implemented this controlled distribution in April of 2010 in advance of a price increase in May, which also failed. (Suppl. Ex. 21.)

7. **April 2010: At a meeting of the Gypsum sales team, a draft customer service bulletin which would have eliminated job quotes was circulated amongst the team. Later in 2010 and continuing into 2011, Mr. Salah discussed the possibility of ending job quotes with a select group of Gypsum's customers and wallboard contractors to find out their reactions to such a change in policy and how it would affect their business with Gypsum. (SOF ¶ 814; Suppl. Ex. 1, Salah Dep. 393:1-13, 405:6-16, 407:7-12; Suppl. Ex. 2, Griffin Dep. 192:13-193:4.)**

In the course of these discussions, one Gypsum customer suggested the very idea that Gypsum could give distributors and contractors price certainty by replacing job quotes with annual pricing: "[j]ust go up $30 on January 1st and that's your price for the year." (SOF ¶ 817; Suppl. Ex. 1, Salah Dep. 392:13-394:7; 538:23-539:8.)

Apparently, Mr. Salah scheduled a meeting on April 14, 2010, the Wednesday following the industry's announcement of a proposed 20% price increase, see SOF ¶ 173, to discuss "what we can do differently with our overall pricing strategy for 2011" and suggesting "do we get away

---

[5] USG Defendants explain in their brief that "controlled distribution," at least in their case, "means that when [Gypsum] expects demand to exceed [Gypsum's] normal production output, which might happen shortly before a price increase, [Gypsum] allocates production volume across its customers based on recent purchase rates. [Gypsum] permits customers to buy a volume of wallboard consistent with their normal ordering patterns but does not permit them to 'stock up' and buy more wallboard than they currently need." (Mot. Memo. at 14.)

from job quotes?" (Ex. 766.) He included a draft customer letter that would have eliminated job quotes. In an email discussing the draft letter, Elaine Chapa noted several concerns, including: "What is the problem we are trying to fix?" (SOF ¶ 155; Ex. 1354.) Ms. Chapa also questioned "how we would get the 'industry' out of a 'competing for jobs' mentality" and whether "this [is] the right time for major pricing strategy change? Customers have many choices and with capacity so low, competitors are anxious to take our share." Ultimately, Gypsum did not attempt to eliminate job quotes in April 2010.

   8. **11/16/2010: Phone call between Al Jordan, L&W's Vice President of Sales & Operations, and David Bates, American's Regional Sales Director, regarding failed price increase attempt. (SOF ¶ 179; Ex. 1428.)**

   L&W's Mr. Jordan summarized a call he had with American's David Bates in an email he wrote to his superiors (L&W's Rob Waterhouse and L&W's Brendan Deely). (SOF ¶ 179; Ex. 1428.) In that email, Mr. Jordan wrote:

> Dave Bates heard that we are not happy with the specifics of their price increase and called today to explain their logic. He assured me they did not do this to punish USG [Defendants]. There has never been a successful December increase in the history of the wallboard industry. All manufacturers have significant price protection through March 31 and it will be difficult to make price go up until price protection expires. . . . He said they need an increase badly just like we do and feels their timing will be the most effective in actually getting it to stick.

(Ex. 1428.) Mr. Deely responded: "Stay pissed. . . . Chicken shut [sic] response to the industry and their customers." (Id.)

   Mr. Bates testified that he did not use any employee at L&W "as an intermediary to communicate information to USG Corp. or any other drywall manufacturer regarding the price of drywall." (Ex. 28, Bates Dep. 142:12-17.)

   9. **2/23/2011: Mark Burkhammer, PABCO's Director of Sales, sent an email to L&W's Al Jordan and Marty Brand. (SOF ¶ 77; Ex. 2204.)**

In this email, Mr. Burkhammer stated:

> I am the person who picked 15 dollars [for the last price increase attempt] so you can somewhat blame me if USG wanted more . . . . I still believe we make great partners and I hope the day comes around soon where we can create successes for one another. Look forward to meeting with you and I will try to keep you informed of pricing information as it unfolds.

(SOF ¶ 77; Ex. 2204.) Mr. Brand forwarded Mr. Burkhammer's email to L&W's Rob Waterhouse and instructed Mr. Waterhouse to "[p]lease don't forward this email." Mr. Waterhouse responded to Mr. Brand that he "will not pass it along or share it in any way" but that "[i]t is helpful for me to see the unedited comments" from PABCO. (Id.)

**10. 2/26/2011-2/28/2011: Representatives from all Defendants attended the meeting of the Drake Group in Charlotte, North Carolina. (SOF ¶¶ 467-69.)**

The Drake Group LLC is a network of approximately 61 gypsum specialty dealers, which uses the aggregate buying power of its members to secure competitive rebates and discounts from vendors, including drywall vendors. The Drake Group does not purchase building products itself; it only negotiates the rebates and discounts made available to its members.

Attendees of this February 2011 Drake Group meeting included Matt Byrne (USG's Vice President of Sales), Chris Griffin (Gypsum's President), Greg Salah (Gypsum's Senior Vice President of Sales and Marketing), and Keith Metcalf (American's Senior Vice President of Sales and Marketing), among others. (Id. ¶ 469.)

**11. April 2011: Representatives from all Defendants attended the Las Vegas Trade Meeting. (PSOF ¶ 79.)**

Both parties agree that the attendees included, at least, David Bates (American), Keith Metcalf (American), Matt Byrne (Gypsum), Steve Bjorklund (Gypsum), Christopher Griffin (Gypsum), Scott Blanchard (Gypsum), Rob Waterhouse (L&W), Donna Sue Mims (PABCO),

Mark Burkhammer (PABCO), Philip Kohl (PABCO), Ryan Lucchetti (PABCO), Todd Thomas (PABCO), Bill Campbell (TIN), Jay Wyatt (TIN), Stephen Raley (TIN); Jay Conlin (Lafarge), Stephen DeMay (Lafarge), Isabelle Shiffrin (Lafarge), Robbe Pearson (Lafarge), Wayne Wilson (Lafarge), Bill Kelly (National) Scott Crutchfield (National), Craig Weisbruch (National), Duane Wood (National), Kurt Withrock (National), John Donaldson (CertainTeed), Steve Hawkins (CertainTeed). (PSOF ¶ 79.)

Plaintiffs also argue that Bill Mazurie (CertainTeed) and John Mixson (National) attended, and they presented evidence that these two were at least pre-registered for the event. (Ex. 1732; <u>see also</u> Ex. 1735) (3/31/2011 email from John Mixon to team at National regarding "INTEX/AWCI Show next week" and noting that "I welcome each of you to join us for dinner [during the trade meeting] if you are available"). Defendants argue these two did not attend, though they present no evidence to support that contention.

**12. 4/14/2011: Rob Waterhouse (L&W) emailed Brendan Deely (L&W/USG Corp.) regarding the ultimately unsuccessful May 16, 2011 price increase noting that he would like to "huddle with Griffin [Gypsum] and Salah [Gypsum] . . . and consider collaborative strategy." (SOF ¶ 69; Ex. 1228.)**

**13. 4/26/2011: Keith Metcalf (Sr. VP of Marketing, Sales, and Distribution, American) emails Rob Waterhouse (Senior VP of Sales and Marketing, L&W) to notify him of a revised price increase date. (SOF ¶ 54; Ex. 1206.) Mr. Waterhouse responds: "You have our support . . . . Please call in a few weeks and we will get caught up." (<u>Id</u>.)**

**14. 4/27/2011: Keith Metcalf (Sr. VP of Marketing, Sales, and Distribution, American) sent internal email indicating that there might be "a movement from all manufacturers to eliminate job quotes." (Ex. 1165.)**

Susan Hall (Dir. of Sales, South, American) sent an email to Keith Metcalf (Sr. VP of Marketing, Sales, and Distribution, American) to ask a question related to how to quote jobs going into calendar year 2012. (Ex. 1165.) Mr. Metcalf responded: "Please don't quote anything in 2012. We may have a movement from all manufacturers to eliminate quotes." (<u>Id</u>.)

When deposed, Mr. Metcalf could not recall the source of the information that caused him to write that email in April 2011. (Ex. 1124, Metcalf Dep. at 140:19-143:11.)

**15. 5/15/2011: Call between Marty Brand (VP of Sales & Operations, L&W) and Mark Burkhammer (Director of Sales, PABCO) regarding Gypsum's pricing plans. (Ex. 2097.)**

Following the call, Mr. Burkhammer (PABCO) sent an email to his superiors at PABCO, Ryan Lucchetti, Todd Thomas, and Foster Duval, stating: "Just spoke to Marty Brand and he informed me that [Gypsum] is still planning on going up [in price] at the end of the month." (Ex. 2097.)

**16. 6/13/2011: The USG Corp. Executive Committee met to conduct a review of the business units' operating plans.**

Mr. Salah presented a plan for wallboard business unit that projected at $60 million loss. In an email to the sales team, Salah stated that the "Executive team was engaged and very clear that ongoing operating losses must be eliminated during 2012." (Suppl. Ex. 41, Salah Dep. 189:8-10-:9 190:9, 190:21-191:10, 193:21-195:11; Suppl. Ex. 42; Suppl. Ex. 43.)

**17. 6/30/2011: Zoran Miling (Analyst, Longbow) emailed Craig Weisbruch (Sr. VP Sales and Marketing, National) to share "some commentary from a few of [National's] peers" (Eagle and Gypsum). (Ex. 1276.)**

Mr. Miling (Analyst, Longbow) wrote that Longbow had "held our Construction Materials Conference last week and wanted to pass along some commentary from a few of your peers." (Ex. 1276.) He then disclosed information regarding Gypsum and Eagle Materials, including those companies' impressions of recent price increase attempts. (Id.) Mr. Weisbruch responded that he "appreciate[d] the insight." (Id.)

Miling stated regarding Gypsum: "The company doesn't typically discuss current volume/pricing . . . ." (Suppl. SOF ¶ 48; Ex. 1276 (emphasis added).)

**18. 7/21/2011: Kathryn Thompson (Founder and Dir. of Research, Thompson) shared information about Gypsum directly with Craig Weisbruch (Sr. VP Sales and Marketing, National). (Ex. 1275; Def. Resp. to PSOF ¶ 86.)**

On July 21, 2011, Craig Weisbruch (Sr. VP of Sales and Marketing, National) emailed to Kathryn Thompson (Founder and Dir. of Research, Thompson): "I can't believe that [Gypsum] is going in to their call tomorrow as the only company to not announce an increase." (Ex. 1275.)

Ms. Thompson responded later that day: "The message I think you will hear from [Gypsum] is they likely won't participate at all. If pressed, they'll say this decision is driven by their belief there is so much protected business in the market. Either way, let's compare notes when [Gypsum] reports." (Id.)

Mr. Weisbruch forwarded her response to Tom Nelson (Pres. and CEO, National), writing: "If true (and it sounds like she's spoken to them), here's a company that has truly run off the tracks." (Id.)

**19. 7/22/2011: Mr. Salah (Gypsum) sent an email to his sales team, emphasizing the need to do something different "to turn around our wallboard business."**

Attached to the email was a draft customer letter, pre-dated September 1, 2011, stating:

> To our Customers;
>
> Effective with wallboard shipments on or after January 1, 2012, USG will no longer offer job quotes and/or price protection. To assist your customers in bidding projects for 2012, U.S. Gypsum Company will establish new pricing which will be effective on all wallboard purchases beginning January 1, 2012. The quoted prices on will be guaranteed for all of 2012. We will notify you of our new price schedule by November 1.

(Class DSOF ¶ 819; Suppl. SOF ¶ 1; Ex. 769.)

This draft included both key elements of the policy that Gypsum eventually announced on September 28: an end to job quotes and a shift to annual pricing beginning January 1, 2012.

On July 24, 2011, Matt Byrne (Vice President of Sales at Gypsum) responded to Mr.

Salah's July 22 email explaining once again that "[Gypsum] doesn't have a job quote problem, our competitors do" and "I'm not sure it's a good idea for [Gypsum] to risk its' [*sic*] credibility any further by trying to change something that's not [Gypsum's] problem." (SOF ¶ 206; Ex. 1367.) Mr. Byrne further stated that "[o]ver the last 2 ½+ years our attempts to lead job quote heavy competitors to price improvements have failed; why would we think we can use our platform to sponsor and lead this intervention"? (Ex. 1367.) Scott Blanchard (Vice President of Sales at Gypsum) responded by revising Mr. Salah's draft letter to modify Gypsum's job quote policy, but not eliminate it. (Ex. 2050; <u>see</u> <u>also</u> Ex. 1347 (July 27, 2011 reaction to Mr. Salah's draft letter by Gypsum Area Sales Manager John Pappas: "Job quotes are a necessary evil in a marketplace like this and there is no policy or strategy that [Gypsum] can implement to change this.").)

**20. 8/2/2011: The Gypsum sales team met to discuss wallboard business performance, where they further discussed job quote elimination. (Class DSOF ¶ 820; Ex. 770; Suppl. Ex. 1, Salah Dep. 413:9–21.)**

Following the August 2nd meeting, on August 8th Mr. Salah sent another email to his team. He stated: "We all agreed last week that job quotes and price protection are the root cause to our pricing problems. . . . We need to develop a plan that gives us the opportunity to realize $10 - $15/MSF of real price improvement on an annual basis. . . . The attached letter (discussed last week in our meeting) and general strategy is one idea." Mr. Salah also challenged his team to provide an alternative approach if they did not believe the no job quotes/annual price strategy would work: "Please give me a bullet point list on why a one year pricing strategy does not make sense. Additionally, if you do not believe this is a viable course of action, give thought on how we gain $10 - $15/MSF of realized price improvement on an annualized basis." (SOF ¶ 821; Suppl. Ex. 4.)

Meanwhile, Mr. Salah sought support for his plan from Gypsum's then-president, Chris Griffin. (Class DSOF ¶ 41.) Major wallboard pricing decisions at Gypsum required the approval of Mr. Griffin and James Metcalf, CEO of USG Corp. (Class DSOF ¶ 349.) On August 5, 2011, Mr. Salah sent Mr. Griffin the current version of the draft pricing letter, stating "this is a high risk pricing strategy but worthy of consideration." (Class DSOF ¶ 822; Ex. 773.)

By the time of Mr. Salah's August 5, 2011 email, Mr. Griffin said that he and Mr. Salah had both "come to the conclusion that this was the right thing to do." Mr. Griffin predicted, based on due diligence he had done with customers, that [Gypsum's] distributors and contractor customers would support the new policy. (Suppl. Ex. 2, Griffin Dep. 177:1-6, 178:6-180:25.) He had spoken "some key distributor customers and some key contractors" and found that by summer 2011, they reacted positively to the idea of eliminating job quotes. (Suppl. SOF ¶ 7; Suppl. Ex. 2, Griffin Dep. 185:11-186:17; 187:3-189:1.)

## 21. 8/15/2011: PABCO communicates to its customer, L&W, its support for efforts to increase prices.

PABCO's Mark Burkhammer (Director of Sales, North) emailed Marty Brand and others at L&W, copying PABCO's President Ryan Lucchetti, to confirm that PABCO would support an upcoming price increase "for all of us" and that he hoped his competitors "also watch the market and take advantage of this opportunity for improvement." (Ex. 1483.) Mr. Burkhammer also wrote:

> I wanted to confirm that Pabco is going to support the upcoming increase . . . . While recent [job] quoting would indicate a total disregard for this increase it is my belief we can't get improvement if we don't challenge the status quo. Once [job quoting] protection runs out and the new quoting kicks in we might actually see improvement, but if we pass then we would need to start all over again. We know there is protection and we hope it gets behind us . . . . there isn't that much work out there to lose. If we don't support this attempt protection will continue to race ahead of any

real increase potential. Quoting has to go up before pricing does . .
. .

(Id.) A few hours later, Mr. Brand forwarded Mr. Burkhammer's message to Rob Waterhouse

with the message: "Fyi, confidential." (Id.)

**22. 8/29/2011: Gypsum and American send nearly identical internal emails regarding price increases. (Exs. 1461, 1462.)**

On August 29, 2011, Gypsum's Mr. Salah sent an email to his staff stating: "I sense this

may be our last opportunity for price improvement in 2011. . . . I remain confident that we are

not the only manufacturer under duress with the current market structure." (Ex. 1462.) That same

day, American's Mr. Metcalf sent an email to his staff similarly stating: "This could very well be

the last opportunity for any price improvement for calendar 2011. This increase should be

supported by everyone. . . . If you have any questions, please give me a call." (Ex. 1461.)

**23. 8/30/2011: Mr. Salah (Gypsum) schedules a team meeting for September 21, 2011 at 7:00 AM for "a 2012 wallboard pricing discussion." (Ex. 774.)**

**24. 9/2/2011: Mr. Salah (Gypsum) sent Mr. Griffin a revised draft of the announcement eliminating job quotes. (Ex. 1481.) Mr. Salah noted that his VPs "have concerns and are working on a second strategy that we will review at our meeting on the 21st [of September]." (Ex. 775.)**

**25. 9/2/2011: That same day, American's Keith Metcalf emails his team regarding ceasing job quoting, setting a moratorium on providing job quotes until September 19th. (SOF ¶ 210; Ex. 1482.)**

Mr. Metcalf's email read:

> I hope this note finds you well as your [*sic*] getting ready to enjoy
> Labor Day weekend. Effective immediately, during the remaining
> time for calendar 2011 no [job] quotes should be given to a
> customer unless they hand you the PO's [purchase orders] that day
> or make a commitment to AG on that job for the balance of the
> year. When looking ahead to January 2012 and moving forward we
> would like to hold off on giving any quotes until September 19th,
> at which time we will reevaluate. Some of this may sound odd but
> if you would like to discuss further please give me a call.

(SOF ¶ 210; Ex. 1482.)

**26. 9/6/2011, 1:45PM: Mr. Metcalf (Sr. VP Sales, Marketing, and Distribution, American) called Rob Waterhouse (Sr. VP of Sales and Operations, L&W); the call lasted 24 seconds. At 1:48PM, Mr. Waterhouse called Mr. Metcalf. The call lasted 4 minutes. (Exs. 2146, 2187.) At 1:56PM: Rob Waterhouse (Sr. VP Sales and Operations, L&W) called Greg Salah (Sr. VP of Sales and Marketing, Gypsum). The call lasted two minutes. (Ex. 2187.)**

**27. 9/7/2011: Mr. Salah emailed the Gypsum leadership an internal draft letter creating an annual price for wallboard and eliminating job quotes. (Ex. 2191.)**

Mr. Griffin and Mr. Salah had discussed the possibility of ending job quotes back in 2010, even before Mr. Griffin became President of Gypsum in fall 2010. (Suppl. Ex. 2, Griffin Dep. 167:13-168:11.)

The next day, Mr. Salah followed up by sending Mr. Griffin a list of pros and cons concerning the proposed new policy. By this point, while Mr. Salah did not have the buy-in of all of his sales team, Mr. Salah was convinced that the pros of the plan outweighed the cons. In his words, "when you're losing money selling everything at a loss, there's not a lot of risk in trying something new." (Class DSOF ¶ 826; Ex. 777; Suppl. Ex. 1, Salah Dep. 436:25-437:11.)

**28. By mid-September, 2011, Mr. Salah felt committed to sending out the new pricing letter.**

On September 13, 2011, Mr. Salah sent his senior sales team (Scott Blanchard, Matt Byrne, and Kevin Courtney) a revised version of the draft pricing letter, dated to be sent on September 21. (Ex. 1485.) This letter pushed the effective date of job quote elimination to January 1, 2012. (SOF ¶ 215; Ex. 1485.) On the same day, Mr. Salah emailed his boss Mr. Griffin some forecasted figures for the annual price increase strategy and reiterated his opinion that the strategy was Gypsum's "best opportunity to move close to break even." (Ex. 780.) Mr. Griffin replied that he was "look[ing] forward to the meeting on the 21st" and expressed his view

that "we have very little to lose to try . . . if we go early and we are alone, we change course." (Id.) (ellipses in original).

On September 14, 2011, Gypsum's Scott Blanchard circulated a memo regarding a "wallboard margin improvement proposal" to his colleagues, including Mr. Salah. (Ex. 778.) In his memo, Mr. Blanchard wrote: "A combination of low demand and a dysfunctional competitive environment has led to weak and erratic results for [Gypsum] over these years. Our price/volume/margin focus have led to a loss of 8 plus points to share, as the customer base is demanding low or market competitive price vs. our value added approach." (Id.) Mr. Blanchard further wrote: "Industry manufacturers have shown no ability or desire to manage their 'job quote policy,' further eroding the ability of all industry participants to improve margins. It is my feeling this will not change regardless of a leadership effort because of the last point." (Id.) Thus, Mr. Blanchard recommended that Gypsum maintain job quotes for "preferred accounts" in order to improve margins. (Id.)

On September 15, 2011 Mr. Salah contacted Mr. Griffin, Mr. Deely, and Mr. Waterhouse (Senior Vice President of Sales and Operations of L&W), noting that "[e]ach of you has seen the proposed letter and had a chance to review it," and stating that "[w]e are in the process of finalizing a change in our wallboard pricing policy for 2012" and that "[i]t is my desire to send the letter next week after Chris [Griffin] and I meet with the Sales Executive team on Wednesday [September 21st]." Mr. Salah scheduled a conference call for September 19 to answer any questions L&W might have about the new policy. (SOF ¶ 45; Ex. 781; Suppl. Ex. 1, Salah Dep. 238:15-22.)

Also on September 15, 2011, Mr. Salah met again with Blanchard, Byrne, and Courtney to discuss wallboard pricing strategy for 2012. At that meeting the sales team agreed that they

had not been able to find a "viable plan that got us to breakeven." (Suppl. Ex. 1, Salah Dep. 449:17-450:16, 454:19-455:21.)

Following that meeting, on September 16 and 17, 2011 Mr. Salah and Ms. Chapa prepared a list of Frequently Asked Questions to be used to communicate with Gypsum's sales force the following Wednesday—September 21—if the decision was made to move forward with the new pricing policy. (Suppl. Ex. 5.) In that list, Ms. Chapa wrote, in response to the hypothetical question of "Are we prepared to lose volume/share in order to successfully implement the new policy?": "Our goal is to maintain our share at a minimum. We will target share growth based on providing greater value than competition to our customers. We will not grow share through preferential pricing. We need to improve wallboard margins." (Id.)

From September 13-16, 2011, personnel from Gypsum, National, and Lafarge attended an AWCI (Association of the Wall and Ceiling Industry) meeting. (SOF ¶¶ 216, 449.) Gypsum's attendees were Steve Bjorklund and Kevin Moyer. (Ex. 1487.)

On September 19, 2011 Mr. Salah emailed a revised version of the pricing letter to Ms. Chapa, noting that it contained "[s]light changes made by corporate communications." Like the previous version, this draft was dated to go out on September 21, 2011. (Suppl. Ex. 6.)

### 29. 9/19/2011: Gypsum management spoke with L&W management (Deely and Waterhouse) about Gypsum's likely plans to eliminate job quotes and go to annual pricing.

Gypsum supplied 90 percent of the wallboard that L&W sold, and the policy changes that Gypsum was then considering would greatly impact L&W's business. (Suppl. Ex. 2, Griffin Dep. 204:17-207:23.) Moreover, Gypsum had a meeting scheduled for September 21, 2011 to determine whether to go forward with its proposed policy changes, and Mr. Salah wanted to answer any L&W questions about the change. (Ex. 781.)

**30. 9/20/2011: American announced calendar-year pricing and the end of job quotes. (Ex. 1489.)**

On September 20, 2011, American circulated to customers a to-the-point announcement:

> **To our Customers:**
>
> Effective January 1, 2012, we will implement a 35% price increase on all gypsum wallboard products. This increased price (up 35%) will be your price for the entire year of 2012. This increase applies to all segments of the business.
>
> Effective immediately, we will no longer be providing job quotes. We thank you for your continued support.

(Ex. 1489.) The letter was signed by Keith Metcalf (Sr. VP Sales, Marketing, and Distribution, American).

Gypsum received a copy of the American letter that day from a customer, Clint Valleau of Allied Interior Products. Allied was one of American's customers and American sent Allied the letter. (Class DSOF ¶¶ 547, 832; Ex. 479; Suppl. Ex. 7; Suppl. Ex. 1, Salah Dep. 461:15–462:12.) Distributors regularly forwarded manufacturer price increase letters they received to other manufacturers. (Suppl. SOF ¶ 14; Suppl. Ex. 8, Brand Dep. 254:2–13.)

At deposition, Mr. Griffin stated that he was "really surprised" by the letter because "we thought we were the only ones thinking about it or really seriously contemplating it." (Class DSOF ¶ 833; Suppl. Ex. 2, Griffin Dep. 196:23–197:11.) Mr. Griffin also testified "no" when asked if he had any "explanation as to why American would have announced a cessation of job quotes right around the same time [Gypsum was] considering doing the same thing?" (Suppl. Ex. 2., Griffin Dep. at 200:15-23.) Mr. Salah likewise did not know American planned to eliminate job quotes, offer customers an annual price, or announce a 35 percent price increase. (Class DSOF ¶ 833; Suppl. Ex. 1, Salah Dep. 105:9–16, 462:13–24, 463:12–464:3.) Nor, to Mr. Salah's knowledge, did anyone else at Gypsum know about American's plans. (Class DSOF ¶ 834;

Suppl. Ex. 1, Salah Dep. 463:12–24.) The American executives responsible for American's letter testified that they did not disclose their plans to anyone outside American's executive leadership. (Class DSOF ¶¶ 541–45.)

Rob Waterhouse of L&W testified that he first became aware of the American letter only after it became public, when it was forwarded to L&W by its supplier PABCO. (Class DSOF ¶¶ 1200, 1201; Ex. 1061; Suppl. Ex. 22, Waterhouse Dep. 200:22-202:15, 280:14-24.) Mr. Brand (VP of Sales and Operations, L&W) likewise testified that he was surprised when he saw American's public letter "[b]ecause it discontinued job quotes, and that was very different from any other price increase letter that I'd seen from any other manufacturer." (Suppl. SOF ¶ 41; Suppl. Ex. 8, Brand Dep. 167:25-168:16, 274:10-275:4.) Mr. Brand also testified that at the time he was not aware that Gypsum was considering ending job quotes. (Suppl. Ex. 8, Brand Dep. 175:22-276:17.) The day the pricing announcement came out, L&W's Mr. Brand said in an email to Mark Burkhammer of PABCO: "Interesting idea. I hope this does fly. I like the way they put it out there 2-1/2 months ahead of time!" (Suppl. Ex. 23.) Mr. Burkhammer responded to Mr. Brand: "Probably not legal but what the heck." (Ex. 1491.) Mr. Brand sent the announcement to Mr. Waterhouse, who responded: "First I have seen or heard, thank you for sending." (Suppl. SOF ¶ 42; Ex. 1061.)

On September 20, 2011, Ryan Lucchetti, President of PABCO, forwarded American's letter to Mark Burkhammer, Todd Thomas, Phil Kohl, and Foster Duval of PABCO, stating: "Well here is the 1st." (SOF ¶ 236; Ex. 1495.) Mr. Burkhammer then forwarded the email string and American's announcement to Marty Brand, Stuart Mann, and Walter Reinthaler at L&W and commented to them, "Hope this works . . .," which Mr. Brand then forwarded on to his supervisor at L&W, Rob Waterhouse. (Id.) Mr. Waterhouse instructed Mr. Brand to "forward to

the other DVP's but remove all [P]abco references and allied references." (Id.)

It was not unusual for distributors to forward manufacturer price increase letters they received to other manufacturers. (Suppl. Ex. 8, Brand Dep. 254:2-13.)

**31. 9/20/2011, 9/21/2011: Internal emails at PABCO, American, and National show that leaders there knew that [Gypsum] was considering the elimination of job quotes.**

On September 20, 2011, Todd Thomas (Director of Sales, South, PABCO) emailed Ryan Lucchetti (President, PABCO) and Mark Burkhammer (Director of Sales, North, PABCO):

> I just heard [Gypsum] is coming out with a letter in the next day or so for a ~$25 – 30 increase January 1st. The letter will include wording about how they will handle job quotes. My understanding [sic] National and American are on board.

(Ex. 1496.) Also on September 20, 2011, after only American had released its price increase and job quote elimination announcement, Todd Campbell (American) sent an email to a customer stating: "It's the first letter, not the last. Beware." (Ex. 1494.)

On September 21, 2011 at 8:17 a.m., Craig Weisbruch (Sr. VP of Marketing and Sales, National) revealed he knew that Gypsum was considering job quote elimination. (Exs. 1500, 1510.)

Mr. Weisbruch received a copy of the American announcement and forwarded it to National's President and CEO (Tom Nelson). In the body of the email Mr. Weisbruch wrote, "Looks like American beat [Gypsum] to the punch. This will be interesting to watch play out." (Ex. 1500.) Mr. Nelson responded, "This might change the outlook slightly."

**32. 9/20/2011: Craig Weisbruch (Sr. VP Sales and Marketing, National) had a call with Kathryn Thompson (Founder and Dir. of Research, Thompson) about job quotes. (See Ex. 1499 ("after our conversation yesterday about job quotes").)**

**33. 9/20/2011: one day before an internal [Gypsum] meeting on the proposed pricing letter, American issued its letter announcing a 35 percent price increase and an end to job quotes. (Class DSOF ¶ 538; Ex. 774.)**

Mr. Salah had scheduled this meeting with a group of Gypsum sales executives to discuss the company's 2012 pricing strategy on August 30, 2011. In attendance would be Vice Presidents of Sales Byrne, Blanchard, and Courtney; Director of Sales Operations Chapa; and Gypsum President Griffin. Mr. Salah challenged his team to present an alternative plan for 2012 that "we can evaluate against the annual price strategy" that he favored. (Class DSOF ¶ 823; Ex. 774.)

Mr. Griffin and the Gypsum sales team met on September 21 as previously planned and decided to release Mr. Salah's pricing letter. (Suppl. SOF ¶ 15; Suppl. Ex. 2, Griffin Dep. 201:18–24, 202:24–204:5.)

By the time of the September 21 meeting, Mr. Griffin testified that he had already made up his mind to go forward with the new policy and planned to communicate the decision to the sales team at the meeting: "it was going to be an opportunity for me to stand up in front of the group and tell them that I appreciated their input but we were moving forward." (Suppl. Ex. 2, Griffin Dep. 202:24-204:5.)

After Mr. Griffin approved the letter on September 21, he needed USG Corp.'s CEO's approval as the final step before moving forward. On September 22, Mr. Salah said in an email to his sales team that before approving the policy change, USG Corp.'s CEO, Mr. Jim Metcalf "wants to see our price and profitability projections." (Class DSOF ¶ 837; Ex. 783.) However, because USG Corp.'s Board of Directors planned to meet on the 22nd and 23rd, Mr. Salah testified that he believed that Mr. Metcalf would not be able to focus on the issue immediately. Mr. Salah therefore set his sights on issuing the letter the week following the board meeting. (Class DSOF ¶ 837; Ex. 783; Ex. 784; Suppl. Ex. 1, Salah Dep. 231:22–232:18, 246:20–247:19.)

**34. 9/21/2011, 6:00 p.m.: American employee indicated awareness that the price increase is not commensurate with demand. (Ex. 1359.)**

The day after the American announcement, David Bates (Director of Sales – West, American) wrote an external email to a distributor related to the American announcement:

> I don't think demand matters anymore. Job quotes are the killers!!!!! I am already hearing Pabco, [Gypsum] and National are going to announce something similar as well. The industry needs this increase badly.

(Ex. 1359.)

### 35. 9/21/2011: A Thompson Flashnote anticipated that the successful elimination of job quotes would require all manufacturers to do so simultaneously. (Ex. 1259.)

On 9/21/2011, Thompson sent out a "flashnote" to clients assessing American's

9/20/2011 letter:

> **The elimination of job quotes effectively stops price protection, which has been the bane of the wallboard industry.** Anywhere from 30%-70% of wallboard pricing is protected in the current market, according to TRG [Thompson Research Group] contacts, which limits the effectiveness of price increases. As one TRG wallboard industry contact quipped this morning, "this is another way of telling the dealers that they are sick of pricing being manipulated by constant job quoting."
>
> ***
>
> **Additional Color**. It is our understanding that [Gypsum] floated the idea of elimination of job quotes to certain customers over the past month or so. *As such, EXP's [American's] letter yesterday effectively supports [Gypsum's] idea and also draws the proverbial line in the sand (i.e., "I dare you not to follow suit").*
>
> **TRG Opinion.** Elimination of job quotes/price protection would be a positive for the wallboard industry, in our opinion. For this to work, however, all wallboard manufacturers would need to fall in line, and *initial checks suggest this could be possible* . . . .

(Ex. 1259) (emphasis in original).

At least American received this report. (Ex. 1259 (Thompson forwarding the report to American to keep American "in the loop").)

**36. 9/22/2011: Greg Salah (Sr. VP of Sales and Marketing, Gypsum) sent an internal email that was optimistic about price improvement. (Ex. 1502.)**

Mr. Salah wrote to Scott Blanchard (VP of Sales, Gypsum) only two days after the American announcement (and before Gypsum issued its announcement): "I do know one thing, we will not lose money in 2012. We have got to get wallboard to a point that we can get U.S. Gypsum to break even." (Ex. 1502.)

**37. 9/27/2011: L&W and PABCO employees discussed the elimination of job quotes. (Ex. 1244.)**

On September 27, after American issued its announcement ending job quotes but before Gypsum or PABCO made any announcement, Mark Burkhammer (Director of Sales, North, PABCO) invited Marty Brand (VP of Sales and Operations, L&W) to dinner through an email. In the email chain, Mr. Burkhammer said:

> Look forward to seeing you and sharing some tales… maybe talk a little strategy if all the announcements are out by then. Even though we haven't officially stated our intention I sent an email to the troops getting them ready. No more job quotes and 30 days to close any open quotes getting our system down to secured work through our distributors with footage and address's. I am suggesting, wherever and to whoever will listen, that the manufacturers have to police. . . . I don't know how this will all work out but it has some people thinking . . . but getting something done by seven manufacturers for the good of the industry is like being in the house of reps in DC.

(Ex. 1244) (first and third ellipses in original).

This was just one of a string of conversations between Mr. Burkhammer and Mr. Brand. (See e.g. SOF ¶¶ 71, 144, 213, 239, 326, 343, 406, 428, 657; Ex. 2140; SOF ¶ 49; Ex. 2097; Ex. 2140; Ex. 1483; Ex. 1491; Mot. at 63; Ex. 1244; Suppl. Ex. 36; Ex. 2176; Ex. 747; Ex. 1596; Ex. 2180; Ex. 2181; Ex. 2182; Ex. 2183; Ex. 2184; Ex. 2185; Ex. 1672; Ex. 1699.)

**38. 9/28/2011: Gypsum sent letter out announcing elimination of job quotes and a shift to calendar-year pricing, but not announcing the specific amount of the January 1, 2012 increase. (Ex. 1617.)**

In an email to L&W's Sale Vice Presidents, Rob Waterhouse (Senior VP of Sales and Operations at L&W) wrote that the success of Gypsum's announcement regarding the elimination of job quotes and price protection, as well as one price for the year, would be "healthy for USG corporation." (SOF ¶ 327; Ex. 1585.) Thus, he instructed the vice presidents not to "make any statements inside or outside of the company that decreases the likelihood of success for [Gypsum]." (Id.)

Upon receiving a copy of [Gypsum's] letter on September 29, 2011, PABCO's Mr. Lucchetti forwarded the letter to other PABCO employees and stated: "[h]ere is the next . . . But will wait a while to know the amount of the increase." (Ex. 1497.)

**39. 10/3/2011: Gypsum's Elaine Chapa comments publicly regarding 2012 price increase. (Ex. 1143.)**

In materials she prepared for an October 10–14, 2011 presentation at the University of Chicago Booth School of Management, Gypsum's Elaine Chapa wrote:

> In 2012, [Gypsum] needs to generate gross profit in our wallboard business. Wallboard is generally seen as a commodity product, and since demand is off significantly since the highs of the early 2000's, price for wallboard has fallen significantly. We need to find a way to counter the laws of supply and demand, and get the price/profitability of our wallboard business up.

(Ex. 1143.)

**40. Late September and early October: other Defendants stopped offering job quotes and announced price increases.**

On September 29, 2011, CertainTeed stopped offering job quotes. (Ex. 1299.) On September 30, 2011, National distributed a letter announcing the elimination of job quotes and a shift to calendar-year pricing. (Ex. 1319.) On October 4, 2011, Lafarge sent out a letter announcing elimination of job quotes and a shift to calendar-year pricing with a 35% increase. (Exs. 1522, 1102.) TIN did not formally announce elimination of job quotes, but quotes were

eliminated by mid-October 2011. (Exs. 1503, 1523.) On October 12, 2011, PABCO announced

elimination of job quotes and implementation of calendar-year pricing with a 35% increase.

(Exs. 1095, 1118, 1320.)

**41. 10/4/2011-10/7/2011: Personnel from multiple Defendants were present at the Gypsum Association committee meetings and/or board meeting in Broomfield, CO, including Joseph Holmes (USG), Philip Kohl (PABCO), Emil Kopilovich (PABCO), Ryan Lucchetti (PABCO), Robbe Pearson (Lafarge), Charles Poandl (Lafarge), Stephen Raley (TIN), Craig Robertson (National), and Mary Schafer (American). (SOF ¶¶ 318, 458.)**

**42. 10/4/2011: Connie Dinning, a USG Corp. Logistics Planning Manager, wrote to Elaine Chapa asking if she should expect a surge in business in December in light of the price increases that several manufacturers had announced for January 1, 2012.**

Ms. Chapa responded that it "is too soon to tell" and "will all depend on if customers

truly feel they will be getting an increase." (Suppl. SOF ¶ 21; Suppl. Ex. 12.) Ms. Chapa then

confirmed that Gypsum should plan on a surge in orders and decide how much wallboard it

wanted to ship in December. (Id.)

That same day, Greg Salah wrote to Ms. Chapa and others confirming that he wanted to

develop a controlled distribution plan for December given "the possibility that Dealers could try

to surge purchases prior to our 1/1/12 price action." (Suppl. SOF ¶ 22; Suppl. Ex. 13.)

**43. 10/5/2011: Greg Salah emailed L&W's Rob Waterhouse to let him know that Gypsum's verbal price guidance would likely be a 35% price increase for 2012, added that "we have elected not [to] deviate from the 35% that is currently on the market." (SOF ¶ 249; Ex. 1507.)**

Later that day, Chris Griffin (President of Gypsum and Executive Vice President of

Operations of USG Corp.) emailed Mr. Salah approving providing 35% verbal guidance. (SOF ¶

249; Ex. 1508.)

**44. 10/11/2011: Longbow issued a report indicating that Longbow was not confident that the price increase for January would stick, which was received by L&W, Gypsum, Lafarge, CertainTeed, and TIN. (Ex. 1342.)**

Longbow summarized the "key takeaway" as being that

industry players recognize the January increase attempt as a new approach to pricing, one that could end up being at least partially successful. However, without capacity reductions or consolidation (assuming Lafarge continues to struggle to find a buyer for its wallboard assets), we are taking a wait and see approach given the difficulty the industry has had in the past securing long term price increase success despite many attempts during the downcycle.

(Ex. 1342 at 1-2.)

Multiple Defendants received this report. (Exs. 1261 (L&W bates stamp), 1349 (USG bates), 578 (Lafarge bates stamp), 1263 (Lafarge bates stamp), 1858 (CertainTeed bates stamp), 2046 (TIN bates stamp).)

**45. 10/14/2011: Lafarge President instructed sales staff to "be firm on this increase" and "toe the line" following a Longbow report that criticized Lafarge for lacking pricing discipline. (Ex. 1263.)**

**46. 10/14/2011: Mr. Salah sent an email to Mr. Griffin, indicating that Gypsum would go on a controlled distribution by 11/1/2011 to prevent flooding the market with cheap board, even though controlling supply was risky because competitors could steal market share. (Ex. 1580.)**

Mr. Salah also wrote that he knew that "a couple of competitors . . . have already gone on controlled distribution." (Ex. 1580.)

By October 14, Mr. Salah had decided that Gypsum should begin controlled distribution earlier than December 1. He reported to Chris Griffin that he learned that a number of customers planned to load up on wallboard before year-end. Mr. Salah did not want to "flood the market with wallboard and incur additional costs" just to satisfy this temporary surge in demand. Mr. Salah said that he intended to produce to "current demand levels" and said that he would use a customer's 60-day shipment average as a "base case" number, with flexibility to increase the number in appropriate circumstances. Mr. Salah recognized the risk that Gypsum could lose some fourth quarter market share if other competitors decided to "produce more product and

flood the market," but believed it was best for Gypsum to maintain production at the level

necessary to meet current demand. (Suppl. SOF ¶ 23; Ex. 1580.)

**47. 10/19/2011: Gypsum expressed concern that competitors might perceive that Gypsum was involved in L&W's job quoting. (Ex. 1564.)**

Rob Waterhouse (Sr. VP of Sales and Operations, L&W) sent Greg Salah (Sr. VP of

Sales and Marketing, Gypsum) some documents related to how L&W was handling the recent

manufacturer price announcements. Salah responded:

> My only concern is your comments on jobs. We are taking a very hard line with all of our customers and not accepting job commitments dealers made on their own. It appears that L&W will be protecting a good deal of jobs and I assume the market will believe we are part of it.

> As a follow-up to our conversations, we will not be able to protect any jobs that were not in our job quote file with a specific identifiable job prior to September 28. Understanding this could cost [Gypsum] volume in 2012, we feel we have no choice but to be very firm on our policy. Job quotes have decimated our pricing over the last 3-4 years. We cannot take a chance of creating the impression that we are not serious about our new pricing policy.

(Ex. 1564.) L&W continued to offer job quotes after Gypsum stopped offering job quotes, but

told customers that "job quotes will fully incorporate the new increased price." (ECF 347-4).)

Also on this day, a Longbow email reported that the Gypsum earnings report call is

scheduled for the next day. Longbow stated "[w]hile they don't typically divulge too much on

the wallboard pricing, it's a topic that will come up on the call." (Suppl. Ex. 28.) In another

email that same day in anticipation of the call, Longbow's Mr. Miling stated "We'll see what

[Gypsum] has to say about the increase on their conference call today. They're generally tight

lipped, so I'd assume not much." (Suppl. Ex. 27.)

**48. 10/21/2011: Ms. Chapa sent an email to Gypsum's sales area managers and regional managers announcing the immediate implementation of controlled distribution.**

She stated that customers would be allowed to purchase wallboard in an amount consistent with their "normal ordering policy" over the past four months. She also noted that many customers were already submitting orders over their normal buying volume. The policy gave the sales VPs discretion to distinguish between "the customer who is truly ordering for a job that needs product" and "a customer who is stocking up his warehouse." (Suppl. SOF ¶ 24; Suppl. Ex. 14.)

On November 1, Mr. Salah sent an email to his sales executives complimenting them on their management of the controlled distribution situation "that developed quicker than any of us expected." He reaffirmed that Gypsum's sales managers needed to "be[] fair to our customers" and "not shift[] product to customers that we tend to favor in the market." That approach applied to L&W as well as other customers. (Suppl. SOF ¶ 25; Suppl. Ex. 15.)

**49. 10/27/2011: Gypsum would not undercut National's pricing when approached by a customer because the job "violate[d] [Gypsum's] pricing policy established on 9/28" and Gypsum was "not in a position to provide special pricing." (Ex. 1553.)**

**50. 11/15/2011: Mr. Salah (Senior VP of Sales and Marketing at Gypsum) told his sales team to emphasize this point: "I want to make sure that we remind our people that this increase is not about share growth or 'getting right.' [sic] It is about maintaining our share at the highest possible price. I know that you understand this but I want to make sure our people stay focused on price improvement." (SOF ¶ 282; Ex. 1548.)**

**51. 11/18/2011: Ms. Chapa provided Mr. Salah with a spreadsheet identifying 47 different geographic markets and proposing a 2012 Gypsum price increase for each.**

Mr. Salah had asked Ms. Chapa to, among other things, prepare this document as Gypsum was ascertaining the prices it would eventually propose to its customers.

Ms. Chapa based the proposals on an analysis of, among other things, Gypsum's current price in each market, the current lowest price competitor in each market, and Gypsum's estimate of its competitor's price for 2012 if it were increased 35 percent (as every other manufacturer

said it planned to do). (Class SOF ¶ 660; Ex. 594; Suppl. Ex. 1, Salah Dep. 482:16-484:8, 486:4-488:19.)

Three days later, on November 21, Ms. Chapa circulated a slightly revised spreadsheet, changing the price in just one market. The November 21 version was the final 2012 pricing spreadsheet. (Suppl. SOF ¶ 18; Ex. 593; Suppl. Ex. 1, Salah Dep. 487:8-488:18.)

**52. 11/28/2011: Gypsum sent an internal email instructing sales staff that they could provide verbal guidance that Gypsum would not quote jobs in 2013 and that the 2013 calendar-year price would likely be +20% from the 2012 calendar price. (Ex. 1671.)**

As Gypsum's September 28, 2011 letter had envisioned, on or about November 28, 2011 Gypsum notified each customer about their individualized 2012 pricing. Gypsum asserts that this timing, with customers notified about new pricing roughly one month before the price went into effect, was consistent with Gypsum's prior practice. (Suppl. SOF ¶ 19; Ex. 595; Suppl. Ex. 1, Salah Dep. 110:4-24, 502:17-20.)

In addition to providing guidance on 2013 pricing, on November 28, 2011, Greg Salah sent an email to Scott Blanchard and Matt Byrne in advance of a telephone conference that afternoon with other Gypsum sales personnel. In that email he stated: "Based on today's current spreads, if we get $10/MSF of price improvement, we could lose ½ of our volume and be no worse off. If we get $20/MSF of realized price improvement, we can lose 10% of our volume and reach break-even for US Gypsum Co." (Ex. 298.)

Gypsum contends that, in setting Gypsum's new prices for 2012, it decided upon a price increase amount to apply in each of 47 different markets. To arrive at new customer-specific prices for 2012, Gypsum asserts that it added the proposed price increase in each customer's market to the customer's current prices. (Suppl. Ex. 1, Salah Dep. 486:21-487:7.)

Gypsum provided each customer's own specific new pricing for 2012 to the customer via an individualized price list on or about November 28, 2011.

In a November 30, 2011 email to the Area Sales Managers, Gypsum Vice President of Sales Scott Blanchard wrote: "Do not bother the Area Managers as they have no authority at this time to adjust price." (SOF ¶ 274; Ex. 1532.)

**53. 11/30/2011: Rob Waterhouse (Senior VP of Sales and Operations at L&W) and others from L&W met with their counterparts at Gypsum to discuss the "Status of wallboard price increase . . . next steps for Building Systems and L&W." (SOF ¶ 408; Ex. 1675.) "Building Systems" was sometimes used internally at USG Corp. to refer to Gypsum. (See, e.g. SOF ¶ 408; Ex. 1130, Salah Dep. at 91:22-92:3.) Shortly after that meeting, L&W issued the same price guidance as Gypsum—plus 20% for January 2013. (SOF ¶ 409; Ex. 1676.)**

**54. 12/27/2011: In an internal Gypsum email, Gypsum's VP of Sales - West indicated that Gypsum would not produce more board despite a shortage. (Ex. 1576.)**

Scott Blanchard (VP Sales – West, Gypsum) received an email regarding board shortage. Mr. Blanchard indicated that Gypsum might run some extra shifts at the plants, but that "[i]t's in the best interest of the market to keep it tight in January." (Ex. 1576.)

At year-end 2011, Gypsum operated at 95 percent effective capacity, based on current staffing levels and available equipment, and shipped all the wallboard it manufactured to its customers. (Suppl. SOF ¶ 26; Suppl. Ex. 1, Salah Dep. 536:3–6; Suppl. Ex. 11, Blanchard Dep. 192:20–193:9, 193:23–194:14.)

**55. 1/20/2012: PABCO and L&W exchange emails. (Ex. 1596.)**

PABCO's Mr. Burkhammer emails L&W's Mr. Brand to inform him that any job quotes that were agreed to prior to the January 1, 2012 elimination of job quotes across the industry "will be monitored to assure we are staying within the agreements we made." (Ex. 1596.) Mr. Burkhammer also wrote that PABCO "believe[s] it is our role to do everything possible to maintain transparency and signal support for the increase we all need so desperately." (Id.)

56. **2/7/2012: Longbow research report on USG Corp. reported, "[m]anagement also stated that it has no intention of undermining the increase – a key concern in the industry – as it views pricing as the best way to improve profitability given weak industry volumes." (Ex. 1594.)**

57. **2/14/2012:Gypsum held a meeting referred to as "Wallboard Price Increase / Planning for Future Announcements (Follow Up)." (Suppl. Ex. 16.)**

Gypsum started developing a logistical plan in advance of any expected price increase announcements so that controlled distribution could be implemented quickly and efficiently in the event of such an announcement, "minimize[] manual intervention and decision making by Sales, Customer Service, the plants and Logistics," and "provide[] overall better service to our customers." (Suppl. Ex. 16.)

58. **2/17/2012: Matt Byrne (on behalf of himself and Scott Blanchard, both of Gypsum) emailed Tim Mahaffey, Brian Murphy, Tracy Hein, and Marty Brand of L&W, writing "In our trading areas L&W has, and continues, to support the overall corporate pricing strategy relating to gypsum wallboard. This effort is not without a handful of challenges….your efforts don't go unnoticed or unappreciated…. Thank you!" (SOF ¶ 347; Ex. 2095.)**

Greg Salah (Gypsum) forwarded this email to Rob Waterhouse (L&W) and noted that it was "a good recap of where we are at." (Ex. 2095.) Mr. Salah further wrote: "So far, everything is falling into place. We appreciate what L&W has done in the market. Your leadership has provided great support for our profitability initiatives. I would ask one favor. I continue to get reports back that the [Gypsum] Area Managers and in some cases Sales Representatives are being pushed very hard for price reductions. This is a unique time and there is no wallboard pricing authority in the field. It all resides in Chicago (Blanchard/Byrne/Salah). We need to have strong relationships in the field and I do not want the L&W Branches to harbor hard feelings around wallboard pricing. Our Area Managers know the consequences of stepping out of line. Any communication regarding this matter you would have with your team would be greatly appreciated." (Id.)

**59. 2/23/2012: A Longbow report summarized the status of the wallboard market in light of the January 2012 changes. (Ex. 1531.)**

One paragraph is most relevant to the tactic of volume restriction:

> The price increase continues to hold at or near the previously communicated level with contacts noting that certain manufacturers – chiefly [Eagle], National Gypsum and CertainTeed – continue to hold the line likely at the expense of volumes. Despite prior concerns to the contrary, both [Gypsum] and Lafarge continue to act rationally. . . . In fact, the various manufacturers we spoke with told us they were more than willing to cede some share at the expense of price and our various discussions with industry contacts supports that view.

(Ex. 1531.)

**60. 2/25/2012-2/27/2012: Defendants' employees attended 2012 Drake Group meeting in San Antonio, TX. (PSOF ¶¶ 412, 470.)**

The parties agree that employees of some defendants attended a February 25-27, 2012 Drake Group meeting in San Antonio, Texas. Drake Group meeting attendees included Scott Blanchard (VP of Sales, Gypsum), Matt Byrne (VP of Sales, Gypsum), Elaine Chapa (Gypsum), Brent Seppa (Gypsum), Cristopher Griffin (President, Gypsum), Greg Salah (Sr. VP of Sales and Marketing, Gypsum), John Donaldson (Pres., Gypsum-North America, CertainTeed), Steve Hawkins (VP of Gypsum Sales, CertainTeed), Keith Metcalf (Sr. VP Sales, Marketing, and Distribution, American), David Powers (President, American), and Craig Weisbruch (Sr. VP of Sales and Marketing, National).

**61. 2/27/2012: The last day of the Drake Group meeting, an internal National email indicated that National learned from dealers that American planned to announce formal guidance. (Ex. 1677.)**

In an email titled "Weekly Report," Bill Kelly (Dir. Deal Sales, National Gypsum) wrote:

"Dealers tell us that American Gypsum will soon be providing price guidance for 2013 in a

written communication telling customers to plan for one price increase in January of 25-30%."

(Ex. 1677.)

**62. 2/28/2012: In an internal Gypsum email, Scott Blanchard (VP Sales – West, Gypsum) wrote a recap of the Drake meeting. Ex. 1638.**

Scott Blanchard (VP Sales – West, Gypsum) summarized the Drake Group meeting for

Greg Salah (Sr. VP Sales and Marketing, Gypsum):

> In general the Drake Meeting was a non-event. Few of the customers "surprised" us at the meeting with requests or market information. There was a more positive outlook for the year with almost all the customers.
>
> From a high level these are the main takeaways:
> - The new Price strategy is being well received by the distributors (helped them)
> - No manufacturer has moved price
> - Some manufacturers are back in old markets because they can make money (greatest concern to distributors)
> - Lower job quotes are escalating 4/1/2012 (protected volume up at least $10/msf or cancelled by our competitors)
>                                                       ***
> - What escalator should they use for 2013 (20-25% was our guideline, further discussion is necessary internally at [Gypsum])

(Ex. 1638.)

**63. 3/1/2012: Keith Metcalf (American) sent Rob Waterhouse (L&W) a copy of American's March 1, 2012 letter informing its customers that they could expect a price increase of 25-30% in 2013. (SOF ¶ 415; Ex. 1679.) Also on March 1, 2012, Greg Salah (Gypsum) forwarded American's letter to his supervisor, Chris Griffin. (SOF ¶ 415; Ex. 1680.)**

**64. 3/10/2012: Gypsum sent internal guidance indicating that Gypsum could not send out a letter for 2013 pricing yet, but permitting sales staff to respond to customer inquiries by providing a verbal 25% increase estimate. (Exs. 1681, 1682.)**

**65. 3/15/2012: Garik Shmois (Analyst, Longbow) spoke with Ken Banas (Sr. Dir. Investor Relations, Gypsum). (Ex. 2168.)**

**66. 4/15/2012 – 4/19/2012: Senior Sales and Marketing personnel from most Defendants gathered at the AWCI/CISCA Convention and INTEX Expo in Charlotte, NC. (PSOF ¶ 79.)**

The parties do not dispute that American, Gypsum, National, Lafarge, CertainTeed, and TIN all sent representatives. Plaintiffs claim that PABCO also had a representative present, but the evidence cited in support of this contention does not confirm attendance by anyone from PABCO.

**67. 4/17/2012: A representative from Longbow called Craig Weisbruch (Sr. VP Sales and Marketing, National); they spoke for approximately 14 minutes. (Ex. 2167; Ex. 1122 Miling Dep. 172:25-177:8.)**

After the call, Garik Shmois (Analyst, Longbow) prepared an email to "Sales Approval" with the subject "[Gypsum] Follow Up with Industry Insider." The first line explains, "We just got off the phone with an SVP (number three in the organization) of a large wallboard manufacturer to get his take on the [Gypsum] results." (Ex. 1600.) This industry insider was Craig Weisbruch.

The call notes indicated Mr. Weisbruch's impression that [Gypsum] was aggressive in January and February at winning share because its ultimate price increase was somewhat lower than expected. "In response to share gains, the rest of the industry responded more aggressively to re-set pricing in March on a customer by customer basis. . . . [Gypsum] has not responded aggressively to the industry re-set which is a good thing longer term." (Id.) Mr. Weisbruch also indicated that he "expect[ed] some of the [Gypsum] share gains to reverse in 2Q. . . . [National] ha[d] won back in the last month the majority of the share it lost to [Gypsum] and he expects most of the industry has rebalanced accordingly. Neither [Gypsum] nor anyone else has been disruptive since the recent re-set." (Id.)

**68. 4/17/2012: Kathryn Thompson (Founder and Dir. of Research, Thompson) spoke with Ken Banas (Sr. Dir. Investor Relations, Gypsum) and others at Gypsum. (Ex. 2168.)**

**69. 4/24/2012: Gypsum Vice President of Sales, Scott Blanchard, told an employee not to pursue new business with a customer because "and 'new' business sticks out like**

**a sore thumb at this point. Our share gain in the first quarter has generated a lot of concern that our reset may have been too aggressive." (SOF ¶ 383; Ex. 1650.)**

**70. 6/19/2012: Gypsum internally circulated an email containing commentary from Longbow about Eagle Materials. (Ex. 1689.)**

Following Eagle's participation at the Longbow Construction Materials Investor Day 2012, Ken Banas (Sr. Dir. Investor Relations, Gypsum) sent an internal email to Gypsum leadership that included Eagle's "thoughts on pricing this year and next." (Ex. 1689.) The quotes in the email were provided directly from Longbow's research note, so it is unclear whether Gypsum also attended Longbow's Investor Day.

Eagle's thoughts on pricing were related to its April announcement of a 25-30% price incase announcement: "While competing manufacturers have yet to follow suit, [Longbow's] recent wallboard survey (see: Pricing Holding as Downside Risks Cleared) indicated that most manufacturers have internally supported the attempt and will likely announce comparable increases of their own in ~3Q12. At this point [Longbow is] modeling ~5% pricing next year, though we admit there is upside to our pricing forecast." (Ex. 1689.)

**71. 7/2/2012: Garik Shmois (Analyst, Longbow) spoke with Ken Banas (Sr. Dir. Investor Relations, Gypsum). (Ex. 2168.)**

**72. 7/2/2012: A Thompson analyst spoke with Ken Banas (Sr. Dir. Investor Relations, Gypsum). (Ex. 2168.)**

**73. 7/11/2012: A Longbow report stated that "Most manufacturers have verbally communicated a 20-30% price increase should be expected for CY13. Formal letters will likely be issued in September and October." (Ex. 1234.)**

**74. 7/16/2012: A Thompson report indicated that Lafarge was telling customers to expect a 25% increase. (Ex. 1690.)**

In addition to the anticipated increase, the report indicated that at "Lafarge also indicated that sometime between Labor Day and mid-October, they will go on 'controlled distribution' (i.e., allocation) in order to prevent excessive pre-buy activity." (Ex. 1690.)

When Gypsum received the report, Ken Banas (Sr. Dr., Inv. Relations) cut out the portion regarding Lafarge noting that it was "worth passing along…" and forwarded it to senior staff at L&W and Gypsum. (Id.)

**75. 7/25/2012: Ms. Thompson (Founder and Dir. of Research, Thompson) spoke with Ken Banas (Sr. Dir. Investor Relations, Gypsum). (Ex. 2168.)**

Also that day, A representative from Thompson called Craig Weisbruch (VP of Sales and Marketing, National); they spoke for about 8 minutes. (Ex. 2167.) A Thompson report issued that day stated that manufacturers were discussing a price increase and that there was a potential for allocation by October. (Ex. 1260.) That report also stated that "Going forward, we remain acutely focused on ensuring that there aren't any cracks in the job elimination efforts." (SOF ¶ 356; Ex. 1260.)

**76. 8/6/2012: In an internal email, PABCO revealed its knowledge of other manufacturers' allocation plans. (Ex. 1709.)**

In an August 6, 2012 email from Mark Burkhammer (Director of Sales, North, PABCO) to, inter alia, Foster Duval (Sales Manager, PABCO) and Ryan Lucchetti (President, PABCO), he wrote: "I was told [Gypsum] is going on allocation in September. We are also looking to allocate but I can't say I was ready to pull the trigger just yet. . . . Other manufacturers are doing the same planning. This will be an annual event to support increases." (Ex. 1709.)

**77. 8/9/2012: Kathryn Thompson (Founder and Dir. of Research, Thompson) spoke with Ken Banas (Sr. Dir. Investor Relations, Gypsum). (Ex. 2168.)**

**78. 8/18/2012: Mr. Salah reported to Mr. Griffin that signs of year-end surge buying were already beginning to appear.**

Mr. Salah reported "We are shipping higher than expected with inventory build a likely contributor." As a result, Mr. Salah planned to go on controlled distribution in the next few weeks. (Suppl. SOF ¶ 29; Suppl. Ex. 17.)

In an August 20, 2012 email, Ms. Chapa stated that the purpose of allocation in advance of the January 2013 price increase was "to prevent pulling next year's business into this year. We do not want customers to load up their warehouses and then not have business in January and February. We do want to service real business to the best of our ability without incurring overtime, etc." (Suppl. Ex. 18.)

**79. 8/22/2012, 12:30pm: Longbow distributed a report with the "scoop" that National would put out an official price increase later that day. (Ex. 1693.)**

Ken Banas (Sr. Dir. Investor Relations, Gypsum) received the Longbow report and forwarded it to the higher ups at L&W and Gypsum, writing:

> [T]he scoop [is] that National is putting out an official 30% price increase letter for next year later today, with "official" language vs. the "to-be-modified" guidance of 20-30% from Eagle earlier in the year.
>
> Channel check info from Longbow shows wallboard supply is getting very tight in many regions, with effective capacity utilization much higher than actual utilization. They comment all of this points to the likelihood of pricing traction next year.

(Ex. 1693.)

When deposed, Craig Weisbruch (Sr. VP Sales and Marketing, National) acknowledged that National was prepared to send the 2013 letter on August 22, 2013, but decided not to send the letter until September 6, 2012. (Ex. 1134, Weisbruch Dep. 300:9-303:3.) He provided no reason for why that was.

**80. 8/22/2012: Kathryn Thompson (Founder and Dir. of Research, Thompson) called Craig Weisbruch (Sr. VP Sales and Marketing, National); they spoke for just over three minutes. (Ex. 2167.)**

**81. 8/22/2012: Garik Shmois (Analyst, Longbow) spoke with Ken Banas (Sr. Dir. Investor Relations, Gypsum). (Ex. 2168.)**

**82. 8/22/2012, 1:51pm: An internal Gypsum email provided that "[i]n an effort to manage anticipated surge buying for the remainder of 2012, we are implementing**

**our Controlled Distribution process for all wallboard shipment on Monday, August 27th." (Ex. 1712.)**

83. **8/27/2012: Controlled distribution went into effect at Gypsum. (Suppl. SOF ¶ 31; Ex. 1712.)**

84. **9/5/2012: In internal Gypsum email, Gypsum Plant Manager expressed frustration about slowing production. (Ex. 1716.)**

Bruce Allen (Plant Manager, Gypsum) writes:

> I'm being told we are only scheduled to run the Sigurd Plant three days due to [Gypsum] controlled allocation. We have the opportunity and staffed [sic] to run four days. . . . We have customers wanting board. So we are going to let our competition pick up our surplus business? And if business is indeed picking up we are going to give it to our competition? I'm being told [Gypsum] logistics, District sales and Manufacturing VP are all on board with this.

(Ex. 1716.) The email was sent to Jeffrey Barth and Jeffrey Broker. The Court does not have a record of their job titles, but by the context of the email, the email appears to be an internal Gypsum communication.

Similarly, on September 10, 2012, Scott Creeger of L&W complained to Jeffery Broker and Randy D'Amura of Gypsum about the shortage of Gypsum wallboard: "I am expected to fill these orders with Pabco board? This is NOT what I want to do and it does not make any sense to me. Trying to keep distributors from loading up is one thing but turning away good work that is happening right now is another. Let's help USG [Corp.] make some money, together." (SOF ¶ 441; Ex. 1717.)

85. **10/5/2012: Longbow Report stated that manufacturers had implemented a nationwide allocation as of mid-September.**

The report quoted a distributor as saying: "We've tried to load up, but none of the manufacturers are adding shifts or additional capacity, so the product just isn't there. The discipline on the manufacturing front is pretty solid as far as maintaining allocation. Anybody

who is trying to go out and rent up warehouses and fill them up will be sorely disappointed." (SOF ¶ 442; Ex. 1696 (Oct. 5, 2012 Longbow Report).) Another Longbow contact reported: "As strange as it sounds, allocation is fairly uniform across all of the manufacturers. There may be some isolated breakdowns in discipline—we haven't seen any—but even some of these players in the past that I would label as first offenders have been rigid in their position." (Id.)

**86. October and November 2012: Other Defendants announced price increases for 2013.**

On October 15, 2012, Lafarge issued its price increase letter reflecting a 30% increase for 2013. (Ex. 1697.) On October 24, 2012, PABCO issued its price increase letter reflecting a 30% increase for 2013. (Ex. 1698.) The following day, PABCO confirmed to a customer that PABCO would not provide job quotes for 2013. (Ex. 1672.) On November 30, 2012, TIN issued a price increase letter reflecting a 30% price increase. (Ex. 1702.)

**87. 10/26/2012: In an internal Gypsum email exchange (10/22-26), Scott Blanchard (VP of Sales, Gypsum) wrote, "I do not think it is in our best interest to move off 'controlled distribution' at this point. CertainTeed and GP will see it and react." (Ex. 1721.)**

**88. 11/16/2012: Gypsum issued price increase letter explaining that the prices would increase and that again, customers would be contacted individually regarding the amount of the increase. (Ex. 1701.)**

A separate email on November 18, 2012 indicated to sales personnel that the price increase would be "25%, which translates to about $40/MSF." (Ex. 1673.) A December 18, 2012 Longbow report noted that Gypsum's $40/MSF increase "is in line with the 30% increases communicated by its [Gypsum's] competitors." (Ex. 1674.)

**89. 11/30/2012: L&W noted that it could not accommodate a lower price for any customer because to do so "would show our competition that we are protecting work and that would have the potential to harm the chances of this increase sticking." (Ex. 1654.)**

Marty Brand (VP of Sales and Operations, L&W) rejected a regional sales manager's request for a flexible price, explaining that "it would show our competition that we are protecting work and that would have the potential to harm the chances of this increase sticking." (Ex. 1654.) Mr. Brand closed by writing, "Hold firm and keep me informed if you hear what the competition is doing in your markets." (Id.)

On December 3, 2012, Greg Salah (Senior VP of Sales and Marketing/National at Gypsum) emailed Rob Waterhouse (Senior VP of Sales and Operations at L&W) regarding Gypsum's 2013 pricing strategy: "Your leadership team should speak with Matt [Byrne] or me if there are any pricing concerns. [Gypsum] Area Managers cannot change a price without approval from Matt in the East and me in the West." (SOF ¶ 433; Ex. 1703.)

**90. 12/7/2012: Longbow issues two reports, and Gypsum leadership is pleased with the report on Gypsum.**

One of the Longbow reports was a summary of Gypsum's meetings with investors in the week leading up to the report. In an internal Gypsum email, Ken Banas (Sr. VP of Investor Relations, Gypsum), wrote that he had spent three days with Garik Shmois (Analyst, Longbow) talking to investors, and that he thought Mr. Shmois "did an accurate job of capturing our key messages around L&W strategic focus, deleveraging the balance sheet and [Gypsum's] commitment to 2013 pricing" in the Longbow report. (Ex. 1237.)

Relevant to those messages, the Longbow report included such lines as: "[W]e heard all the right things about [Gypsum's] willingness to support the industry's January 1 price increase . . . Our discussions with management confirms that 'they get it' in that pricing is more important than volume . . . and that disruptive pricing behavior on the company's part could quickly undermine the pricing strength seen over the past year." (Ex. 2195.) At least one manufacturer, Lafarge, received the report. (Ex. 1364.)

**91. 12/13/2012: Garik Shmois (Analyst, Longbow) spoke with Ken Banas (Sr. Dir. Investor Relations, Gypsum). (Ex. 2168.)**

**92. 12/17/2012: Garik Shmois (Analyst, Longbow) spoke with Ken Banas (Sr. Dir. Investor Relations, Gypsum). (Ex. 2168.)**

**93. 12/18/2012: Longbow report indicated that manufacturers' elimination of job quotes remained in effect for 2013 and commented on the controlled distribution and capacity of manufacturers going into 2013. The report confirmed that CertainTeed, National, American, and Georgia-Pacific were not offering job quotes. The report also commented on manufacturer allocation. (Ex. 1674.)**

As for the elimination of job quotes, the report indicated:

> We note that throughout the course of the downturn, job quotes obstructed manufacturers' ability to ultimately realize price increases; however since the elimination of this practice, manufacturers have been able to shift price risk from themselves and onto the distributor and ultimately the contractor as distributors themselves . . . have remained largely disciplined. Again, this has allowed for greater price certainty in the market and thereby has allowed contractors and distributors to compete more on service rather than price.

(Ex. 1674 at 9.)

As to future pricing:

> Future Pricing: The entire industry has thus far communicated their pricing intentions for 2013 in written form. National Gypsum, CertainTeed, Lafarge and Temple-Inland have each announced an increase of 30% whereas American Gypsum (EXP) has announced an increase of 25%. Neither Georgia-Pacific nor [Gypsum] have announced a dollar amount, through [sic] distribution contacts report that each is communicating an increase of $40/MSF, which is ~30%. Additionally, as L&W is out with a $50/MSF price increase, we believe 2013 pricing will exceed our prior expectations.

(Ex. 1674 at report p. 2.)

**94. 12/21/2012: In USG Corp.'s Form 10-K for financial year ending 12/21/2012, USG Corp. indicated that demand was low for wallboard. (Ex. 1222 at 7.)**

**95. 12/26/2012: Greg Salah (Sr. VP Sales and Marketing, Gypsum) wrote that there couldn't be any "slop over" with price despite shipping issues because of potential market reaction. (Ex. 1708.)**

In response to emails that severe weather was causing shipping problems, Greg Salah wrote internally at Gypsum: "We cannot do any slop over. To great of a risk of perception that we are pursuing share at the expense of price. Let customers over react if necessary" (Ex. 1708.) Mr. Byrne responded to Mr. Salah's email: "[C]ompletely agree on the price piece . . . too risky. (Id.) (ellipses in original).

## III.   LEGAL STANDARD

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. Under Federal Rule of Civil Procedure 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Id. at 255.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." Id. at 325.

After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule, [] set forth specific facts showing a genuine issue for trial." Stell v. PMC Techs., Inc., No. 04-5739, 2006 WL 2540776, at *1 (E.D. Pa. Aug. 29, 2006) (Baylson, J.) (citing Fed. R. Civ. P. 56(e)); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (The nonmoving party "must do more than simply show that there is some metaphysical dispute as so the material facts."). Summary judgment is appropriate if the adverse party fails to rebut by making a factual showing "sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

IV.     **PARTIES' CONTENTIONS**

A.      **The USG Defendants' Motion**

The USG Defendants assert that summary judgment should be granted in their favor because (1) the timing and content of its pricing letters reflect independent decision-making; (2) there is no evidence of a conspiratorial communications between Gypsum and L&W; (3) Gypsum's communications with analysts are insufficient to send the question of conspiracy to a jury; and (4) Gypsum's controlled distribution policy served its own interests. (Mot. Memo. at 22-35.) Defendants also points out that Plaintiffs have not "distinguish[ed] between USG Corporation and [Gypsum] in their substantive allegations but instead refer to them collectively as 'USG.'" (Id. at 35.)

In arguing that its actions were reflective of independent decision-making, Defendants point to the previous summary judgment decision, where the Court concluded as to CertainTeed that "[t]he relative lack of evidence that CertainTeed communicated with other manufacturers or analysts coupled with the evidence that CertainTeed did take steps indicative of independent

decision making, result in the Court's conclusion that a jury could not reasonably make the inference that CertainTeed participated in an agreement in restraint of trade." (Mem. Op. at 154.) Defendants assert they are similar to CertainTeed, and contrast their internal process with American's failure to present evidence that it engaged in any internal decision-making process before announcing pricing changes. (Id. at 101.)

Defendants cite to a number of internal meetings and draft letters circulated between April 2011 and September 2011, leading up to its announcement to increase prices and end job quotes. (Mot. Memo. at 24.) Defendants also argue that there is no evidence that Gypsum knew of American's announcement before it occurred. (Id.) Moreover, Defendants argue that the Gypsum pricing letter "differed in substantial ways from the letters issued by the other defendants" because it did not announce what the new pricing would be, did not adopt a percentage increase, did not initially provide individual pricing to customers, and did not aim at price increases at the same level of the other defendants. (Id. at 25.)

Defendants support their argument that there are no conspiratorial Gypsum or L&W intercorporate communications by addressing two statements evaluated in this Court's July 2016 Motion to Dismiss (13-MD-4237 ECF 422) as well as our summary judgment decision in the class case. These specific communications are addressed below.

Defendants contend that there is no evidence that Gypsum communicated confidential pricing information to industry analysts, noting that in fact "considerable evidence exists that [Gypsum] was viewed by analysts as being 'tight-lipped' about pricing information." (Mot. Memo. at 31.) Defendants also argue that witnesses from Longbow and Thompson testified that Gypsum did not provide confidential information, and cite to documents where analysts "were opaque on [Gypsum's] pricing intentions." (Id. at 31-32.)

Finally, Defendants rationalize their controlled distribution policy by arguing that "it made economic sense for [Gypsum] to produce at its planned volume levels in 2011 and service 2012's demand in 2012. [Gypsum] realized that this policy might cause it to lose some sales volume that it could have captured with ramped up production, but determined that the benefits of controlled distribution outweighed that cost." (Id. at 33.)[6]

### B.  Homebuilder Plaintiffs' response

Plaintiffs respond by first arguing that the Court has already been presented with sufficient evidence, including "traditional conspiracy" evidence, of Gypsum's participation in the alleged price-fixing conspiracy, and that the Court relied on this evidence in denying summary judgment to other defendants in the class case. (Resp., ECF 358 at 9.) Plaintiffs also assert that Gypsum engaged in "extensive inter-corporate communications with their competitors," and that the evidence does not support Gypsum's framing of their price letter as a result of "independent decision making." (Id. at 18-24.) Plaintiffs argue that the facts tying Gypsum to the alleged conspiracy are "significantly stronger" than those tying CertainTeed to the alleged conspiracy. (Id. at 45-46.) Finally, Plaintiffs argue that the "USG Defendants—which include USG Corporation, United States Gypsum, and L&W Supply Corporation—were at all relevant times 'considered one company by the market.'" (Id. at 46.)

---

[6] In a footnote, the USG Defendants also "adopt[ed] the Valspar[v. E.I. Du Pont De Nemours & Co., 873 F.3d 185, 193 (3d Cir. 2017)] arguments made in the National motion [for summary judgment], as well as any similar motions that Defendant PABCO may file." (Mot. Memo. at 3, n. 6.) Accordingly, the USG Defendants did not address Valspar "because, even on the Court's original approach in its class summary judgment opinion, USG [Defendants] should be granted summary judgment." (Id.) The Court has considered Valspar below in our analysis of the "plus factors" as well as of traditional conspiracy evidence.

### C.    USG Defendants' Reply

In reply, Defendants contend that Plaintiffs have relied on ambiguous evidence that is as consistent with legal conduct as it is with conspiracy. (Reply, ECF 366 at 2-4.) Rather, Defendants maintain that their September 2011 pricing letter was the result of independent decision making, and that Plaintiffs have not offered evidence to rebut that. (Id. at 4-17.) Defendants also take issue with Plaintiffs' attempt to demonstrate that L&W participated in the conspiracy, arguing that all of the communications it had with other manufacturers was "innocuous" and that, moreover, Plaintiffs have not identified a "single relevant [Gypsum] communication." (Id. at 23-27.) Finally, Defendants assert that the statements made by American, National and Lafarge cannot be attributed to Gypsum or L&W under Bourjaily v. United States, 483 U.S. 171 (1987). (Id. at 28-30.)

### D.    Supplemental briefs

After oral argument, the Court requested that both parties file supplemental briefs addressing issues raised during argument. Chief amongst these issues was the relationship between Gypsum and L&W.

Plaintiffs argued that there was "very little, if any, separation between the two subsidiaries" and that "the record makes clear that USG Corp., [Gypsum], and L&W routinely collaborated on and dictated each other's pricing and pricing strategies." (Pl. Suppl. Br. at 3.) Moreover, Plaintiffs assert that Gypsum and L&W had aligned interests. (Id. at 4.)

Defendants disagreed, contending that L&W acted independently in setting its own prices, that L&W only learned of the Gypsum September 2011 price increase shortly before it was publicly announced, and that L&W had legitimate business reasons to communicate with other defendants. (Def. Suppl. Br. at 5-10.) Defendants focus upon the testimony of Gypsum and

L&W employees that they did not conspire with each other to fix prices or end job quotes. (Id. at 2-5.)

In addition to addressing the relationship between Gypsum and L&W, Plaintiffs seem to concede that they are not seeking to hold USG Defendants liable based upon their communications with industry experts. (Pl. Suppl. Br. at 20) ("Defendants' proposed revisions [to the Court's original proposed chronology ¶¶ 43, 52, 55, 58, 59, 61, 63, 67, 77, and 78] are unnecessary in that Plaintiffs' evidence against USG Defendants does not rely on research analysts to link [Gypsum] and L&W to the conspiracy.") The Court addresses these communications, or lack thereof, briefly in the discussion.

## V.    DISCUSSION

The Court's analysis of the USG Defendants' motion will first examine the liability of USG Corp. It will then address the traditional conspiracy evidence presented against Gypsum and L&W. The Court incorporates by reference its prior discussion of the legal standards governing oligopoly price-fixing cases (Mem. Op. at 20-30) and addresses new case law where appropriate.

As noted above, Defendants assert that summary judgment should be granted in their favor because, unlike the other defendants to whom this Court denied summary judgment in 2016, its price increase letter was the result of independent decision making. Plaintiffs, however, assert that much of the evidence that this Court relied upon in the prior decision applies with equal force to the USG Defendants, and that there is additional evidence demonstrating that the USG Defendants played a "central role" in the conspiracy.

In the prior summary judgment opinion, which explicitly did not consider evidence against the USG Defendants, the Court observed that to survive summary judgment, Plaintiffs needed to show that a jury could find:

1. Defendants' behavior was parallel;

2. Defendants were conscious of each other's conduct and awareness was an element in their decision-making processes; and

3. Plus factors showing an actual agreement: (1) motive, (2) actions contrary to Defendants' interests, and (3) traditional conspiracy evidence.

(Mem. Op. at 138) (citing In re Flat Glass Antitrust Litig., 385 F.3d 350, 360 n.11 (3d Cir. 2004).

As noted in that prior opinion, and as applies to the Court's consideration of the USG Defendants' motion, Defendants do not meaningfully contest the first two elements because their argument was basically that they were "merely following the leader." (Mem. Op. at 138.) Moreover, the Court noted that "[e]ven if Defendants' theory of defense had been different, Plaintiffs have presented more than sufficient evidence for a jury to find that the first two elements have been satisfied." (Id.) This observation applies here, and accordingly the Court is similarly left to consider the "plus factors" and determine whether Plaintiffs have presented sufficient evidence that the plus factors would indicate that there was an agreement to fix prices. "Once the plaintiffs have presented evidence of the defendants' consciously parallel pricing and supplemented this evidence with plus factors, a rebuttable presumption of conspiracy arises." In re Baby Food Antitrust Litig., 166 F.3d 112, 122 (3d Cir. 1999).

Although all three plus factors are "weighed together, in the case of oligopolies the first two factors are deemphasized because they 'largely restate the phenomenon of interdependence.'" Valspar Corp. v. E.I. Du Pont De Nemours & Co., 873 F.3d 185, 193 (3d Cir.

2017) (quoting <u>Flat Glass</u>, 385 F.3d at 360). Thus, traditional conspiracy evidence ends up

becoming the most critical plus factor in cases of oligopolies. "After evaluating the evidence

through our plus factor analysis, we then assess whether, '[c]onsidering the evidence as a whole,'

it is 'more likely than not [that the defendants] conspired to fix prices.'" <u>Id.</u> at 194 (quoting <u>In re</u>

<u>Chocolate Confectionary Antitrust Litig.</u>, 801 F.3d 383, 412 (3d Cir. 2015)).

### A.     Liability of USG Corp.

Plaintiffs make no attempt to present facts demonstrating specifically that USG Corp., the

parent company of Gypsum and L&W, was itself involved in communications with competitors

to fix prices or price movements, etc. Rather, Plaintiffs contend that because L&W and Gypsum

were so closely situated, all three corporate entities are liable. The Court disagrees. USG Corp.

validly set up Gypsum and L&W as subsidiaries, making them sister corporations. Moreover,

"the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a

single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly owned

subsidiary have a complete unity of interest." <u>Copperweld Corp. v. Indep. Tube Corp.</u>, 467 U.S.

752, 771 (1984). The Court will grant summary judgment in favor of USG Corp.

### B.     Liability of Gypsum and L&W – Consideration of Plus Factors

#### 1.     Motive

As the Court noted in the prior decision, "[i]t cannot be seriously contested that a jury

could find that Defendants had the motive to enter an agreement to raise prices. Defendants own

documents are littered with references to manufacturer's poor financial performance and the dire

straits of the industry." (Mem. Op. at 139.) Despite Gypsum's position as the industry leader, it

was experiencing this poor performance as well, as is particularly evident in the communications

amongst the Gypsum sales team in the summer of 2011. The fact that Gypsum was searching for

a way to "turn our wallboard business around" demonstrates that Gypsum was not immune from the "dire straits" the other defendants were feeling. As previously noted, however, the presence of a motive does not end the Court's inquiry of plus factors.

### 2. Actions Against Self-Interest

The Court previously discussed the challenges presented with determining whether actions of a defendant in an oligopolistic market are against its self-interest. (See Mem. Op. 140-42.) In that opinion, the Court noted that three actions could have been found to be against the defendants' self-interest in the class action: (1) announcing a 35% price increase despite meaningful increase in demand; (2) eliminating job quotes; and (3) artificially limiting supply. (Id. at 141.)

The Court's previous discussion cannot be directly applied to Gypsum, however, because Gypsum did not announce a percentage price increase that applied equally to all of its customers. Rather, Gypsum's September 2011 letter announced that customers would be given their price increase privately through "individual customer price lists." (Ex 595.) The individual price list shows that prices increased from 0% for some customers to 29.17% for others. (Ex. 596.)

With regard to Gypsum's decision to institute a controlled distribution program, Defendants assert that this decision was instituted to minimize cost and production disruption and to maximize profit, and that controlled distribution was a "well established" Gypsum practice. (Mot. Memo. at 14-18.) Plaintiffs call this argument a "red herring," arguing that the record supports a conclusion that Gypsum's controlled distribution plan in anticipation of a price increase was not regular practice, and moreover, that Gypsum could have "increased capacity" rather than limiting supply. (Resp. at 17-18, n. 9.)

The Court has previously addressed Gypsum's decision to limit supply, explaining the controlled distribution plans instituted by Gypsum and other manufacturers before the 2012 and 2013 price increases in our prior opinion. (See Mem. Op. at 132-35.) The Court then concluded that "[a]lthough . . . Plaintiffs have submitted sufficient evidence for a jury to conclude that all Defendants acted against their self-interest [by artificially limiting supply of drywall], the Court recognizes that this finding is not sufficient, by itself, to defeat summary judgment because Plaintiffs have not yet tended to exclude the possibility of interdependent conduct." (Id. at 145.) This conclusion was warranted because "[b]y nature, oligopolistic markets are conducive to price fixing and will often exhibit behavior that would not be expected in competitive markets. . . . Therefore, these factors are neither necessary nor sufficient to preclude summary judgment, at least where the claim is price fixing among oligopolists." Chocolate, 801 F.3d at 398. Thus, instead of relying on evidence that defendants went on a controlled distribution program, the Court focused upon traditional conspiracy evidence. The Court's discussion in that opinion is applicable to the USG Defendants' motion.

With regard to the self-interest of L&W, Plaintiffs argue that "[i]f L&W was truly independent, as argued by USG Defendants, L&W would be incentivized *not* to share its pricing strategies with [Gypsum]. But this was definitely not the case. L&W routinely shared internal pricing information with [Gypsum]." (Pl. Suppl. Br. 4-5, n. 6.) Assuming that, as Defendants argue, L&W was primarily a purchaser of drywall, it would have had an incentive to oppose a price increase, as that meant that it would be paying more for its drywall.

### 3. Traditional Conspiracy Evidence

Traditional conspiracy evidence is "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings,

conversations, or exchanged documents are shown." Valspar, 873 F.3d at 193 (quoting Flat Glass, 385 F.3d at 361). In Valspar, the Court of Appeals indicated that at least one method of evaluating traditional conspiracy evidence is by "first considering individual groups of evidence to see whether any raise an inference of conspiracy, before evaluating all of the proof in context. Id. at 198.

The USG Defendants' motion focuses upon traditional conspiracy evidence, and Defendants assert that there is no such evidence against it because "[t]he facts as to the USG Defendants differ in critical ways from the facts as to the four defendants who were denied summary judgment in the class cases." (Mot. Memo. at 1.) Plaintiffs, on the other hand, assert that the Court has already addressed the traditional conspiracy evidence relevant to the USG Defendants' motion.

Plaintiffs begin by citing thirteen of "the most pertinent inter-corporate communications." (Resp. at 19-22.) The Court broadly categorizes these as (1) communications between Gypsum and L&W, and (2) communications between L&W and other defendants.

### a.       Communication between Gypsum and L&W

Plaintiffs argue that "communications with L&W should be considered to be communications with [Gypsum] and vice versa." (Resp. at 19.) The specific conspiratorial conduct that Plaintiffs alleged in their complaint to be attributable to L&W include that "in its role as a wallboard distributor, [L&W] was used to facilitate and monitor the conspiracy as an intermediary between [Gypsum] and other Defendants, and engaged in frequent discussions with other Defendants, including PABCO . . ., about pricing strategies for the industry." (TAC at ¶ 226.) Because all of the specific inter-corporate communications cited by Plaintiffs are with L&W, rather than Gypsum itself, an understanding of the relationship between these sister

corporations is critical to the Court determining whether Gypsum treated L&W as a conduit to communicate pricing information to its competitors.

As a general matter, Plaintiffs contend that L&W and Gypsum were "effectively one in the same, each representing one half of the whole of USG Corporation's fully-integrated drywall business, overlapping in nearly every way and possessing identical objectives and goals." (Pl. Suppl. Br. at 2.) Defendants asserts that there are two important parts of the relationship between L&W and Gypsum for the purposes of this motion: "the two entities had different business objectives, and [Gypsum] and L&W each set their own prices." (Def. Suppl. Br. at 5.)

Defendants argue that because the two companies had competing interests as buyer and seller, "their objectives were sometimes in tension," especially when it came to pricing. (Id. at 6.) Defendants also asserts that Gypsum was did not "calling the shots on pricing at L&W," but did exercise some influence "because [Gypsum] set the price of drywall that [Gypsum] sold to L&W." (Id. at 7.) Plaintiffs contend that Gypsum and L&W had aligned interest, and "[a]s such, there was no differentiation between USG Corp., [Gypsum], and L&W with regard to the sharing of competitor information obtained at trade association meetings." (Pl. Suppl. Br. at 4-5.)

Defendants point to the fact that L&W only learned of Gypsum's September 2011 pricing decision about ten days before it announced its price increase, which Salah explained during his deposition was because L&W was Gypsum's "largest customer in the specialty dealer channel. And we felt it was appropriate for us to make them aware of what we were doing and able to answer any questions, and that's why we did it." (Def. Suppl. Br. at 8) (quoting Ex. 1130, Salah Dep. 238:15-22.) Gypsum also asserts that it told L&W about its increased 2012 prices at the same time that it informed other customers. (Id.)

Plaintiffs argue that that the evidence supports a conclusion that L&W knew of the price increase before the communication about ten days before. (Pl. Suppl. Br. at 2, n. 1.) Moreover, Plaintiffs provide record citations that demonstrate that USG Corp. "controlled and directed drywall pricing for both L&W and [Gypsum]." (Pl. Suppl. Br. at 3.) In particular, Plaintiffs cite to an email from Blanchard (Gypsum) to Tim Mahaffey (VP, Southern Division, L&W) stating that "L&W is following, as are we, the path set by the senior management of the company, not to engage in low wallboard pricing." (Ex. 1233. See also Ex. 1228 (April 2011 email from Waterhouse (L&W) to Deely (L&W) stating that they should "huddle with Griffin and Salah in Rhode Island Monday evening and consider our collaborative strategy.")) Plaintiffs also seem to assert that it was likely that L&W were "actively involved in reviewing [Gypsum's] draft announcement," although Plaintiffs provide no evidence to directly support this assertion, except for the fact that individuals from Gypsum and L&W clearly discussed the letter before it was made public, which Defendants admit. (Pl. Suppl. Br. 6-7.)

Moreover, Plaintiffs contend that Gypsum "demand[ed] that L&W take the same position on job quotes and price increases," citing to a February 2012 email where Salah told his Gypsum sales team: "If L&W plays games on jobs it puts our increase at risk. It allows them to sell at lower prices which gives the market the perception that [Gypsum] and/or L&W are not up. If you find a situation where L&W is cheating, I want swift action. L&W price improvement is the lowest in the company." (Pl. Suppl. Br. at 5) (citing Ex. 1235.)

Defendants next argue that L&W had a "legitimate business reasons" for communicating with other manufacturers about pricing, including that it "stood to increase its own margins when its suppliers raised prices, provided it was able to pass those increases on to its customers." (Def. Suppl. Br. at 8-9.) Defendants argues that L&W had a reason to support price increases by

Gypsum's competitors because L&W often "perceived itself at a disadvantage because it had to buy a substantial fraction of its volume from [Gypsum], even if [Gypsum's] product were not always the cheapest." (Id. at 9 ) (citing Ex. 1130, Salah Dep. 602:6-13 ("L&W in the vast majority of their markets do not have access to competitors' products, because they won't sell them. L&W guesses at what they believe the price is in the market. And there's a culture at L&W of US Gypsum Company charging them higher prices than where they could buy if they had the ability to buy from other manufacturers."))

Plaintiffs contend, however, that:

> USG Defendants also have no plausible explanation for the resulting confluence of events on September 19, 2011: (i) American's moratorium on job quotes until that date; (ii) the 7:00 am meeting the same day by senior pricing officials at both [Gypsum] and L&W; (iii) the 11:43 am, 19 minute call between American's Dave Powers and PABCO's Foster Duval; and (iv) the call, minutes later, between L&W and Mr. Duval that lasted 12 minutes. . The very next day, on September 20, 2011, American (which accounted for only about 10% of total U.S. drywall sales) officially announced calendar-year pricing and the end of job quotes. Following American's announcement and before [Gypsum] or any other manufacturer issued their own announcement, Mr. Salah reported internally: "I do know one thing, we will not lose money in 2012."

(Pl. Suppl. Br. at 9) (citations to chronology omitted).) Plaintiffs assert that any one of the events above are "sufficient to establish a genuine dispute as to L&W's purported independence from [Gypsum]." (Id.)

As discussed further below, L&W was clearly receiving information from other manufacturers, such as PABCO, about price increases around the same time period.[7] In spite of the fact that Gypsum and L&W shared offices, had common legal, human resources, accounting,

---

[7] The Court discussed these in our prior opinion in a section entitled "September L&W Phone Calls." (Mem. Op. at 113-115.)

and finance teams, both had employees who sat on USG Corp.'s Executive Committee, and were in close and constant contact, Plaintiffs have not put forward sufficient evidence to raise an inference that L&W was acting as an agent for Gypsum in its communications with other manufacturers, or that L&W was improperly involved in Gypsum pricing decisions. Moreover, Plaintiffs have pointed to no evidence in the record to show that L&W shared pricing information about other manufacturers with Gypsum.

### b. Communications between L&W and other manufacturers

The next category of proof that Plaintiffs allege to be traditional conspiracy evidence are communications between L&W and other manufacturers. Below are the communications that appear to be supported by the record and potentially relevant to the issue of L&W's participation in the alleged conspiracy.

- PABCO and American communications, as laid out in the Court's previous opinion. (See Mem. Op. at 115-117.)

- November 16, 2010 call between Al Jordan (L&W) and David Bates (American), after which Jordan writes to Brendan Deely, President and CEO of L&W and Sr. VP of USG Corp., saying "David Bates heard that we are not happy with the specifics of their price increase and called today to explain their logic. He assured me they did not do this to punish [Gypsum]." (Ex. 1428.)

- February 23, 2011 email between Jordan (L&W)/Marty Brand (L&W) and Mark Burkhammer (PABCO) where Burkhammer says that "I am the person who picked 15 dollars so you can somewhat blame me if [Gypsum] wanted more." (Ex. 2204.)

- April 26, 2011 email between Rob Waterhouse (L&W) and Keith Metcalf (American) where Metcalf tells Waterhouse of the planned update, and Waterhouse responds "You have our support." Metcalf then forwards Waterhouse's email to his superiors. (Ex. 1206.) The next day, Metcalf sends the email reporting that "[w]e may have a movement from all manufacturers to eliminate job quotes." (Ex. 1165.)

- May 21, 2011 internal email where Burkhammer (PABCO) reports to others at PABCO that he "[j]ust spoke with Marty Brand and he informed me that [Gypsum] is still planning on going up at the end of the month… hasn't heard a word about others… just fyi" (Ex. 2097) (emphasis in original).

- September 20, 2011 email between Waterhouse (L&W) and Metcalf/Powers (American), where, upon hearing that Waterhouse was sent a copy of the American letter announcing the price increase and elimination of job quotes, Powers responds "GREAT THIS WILL BE A GOOD DAY." (Ex. 1212.)

- September 27, 2011 email between Brand (L&W) and Burkhammer (PABCO) where Burkhammer says "Look forward to seeing you and sharing some tales… maybe talk a little strategy if all the announcements are out by then. . . . I don't know how this will all work out but it has some people thinking… but getting something done by seven manufacturers for the good of the industry is like being in the house of reps in DC." (Ex. 1244.)[8]

While certain of these communications may be relevant, none provide "smoking gun" traditional conspiracy evidence. Together, however, they present a foundation from which a jury could conclude that L&W was coordinating with manufacturers

In the prior opinion, before considering evidence specific to each defendant, the Court noted that the following evidence "alone might prove to be sufficient traditional conspiracy evidence for a jury to conclude that Defendants reached an agreement in violation of the Sherman Act":

1. Keith Metcalf's (Sr. VP Marketing, Sales, and Distribution, American) April 2011 email indicating that there might be "a movement from all manufacturers to eliminate quotes," which was written a few weeks after all Defendants sent representatives to the Las Vegas trade meeting (Ex. 1165);

2. the notes from the call between Steve DeMay (VP of Sales, Lafarge) and Zoran Miling (Analyst, Longbow), indicating that National, Lafarge, and CertainTeed would react to certain price moves by [Gypsum] (Ex. 1269); and

3. the notes from the meeting between Kathryn Thompson (Founder and Dir. of Research, Thompson) and Craig Weisbruch (Sr. VP Marketing and Sales, National) indicating that there were *verbal agreements* for a large price increase in 2013 (Ex. 1515).

---

[8] Plaintiffs contend that this meeting happened, and cite to Ex. 1244 as proof. The email exchange at that exhibit is from September 27, 2011. The Court does not find evidence that, as Plaintiffs assert, Brand and Burkhammer "met for 'a conversation over a couple of drinks and some appetizers' to 'talk a little strategy' about their planned price increases and plot to eliminate job quotes 'for the good of the industry.'" (Resp. at 21.)

(Mem. Op. at 146-47.) Plaintiffs contend that each of these actions link Gypsum to the alleged conspiracy. (Resp. at 10-11.) Moreover, Plaintiffs assert that "[Gypsum] is the largest manufacturer of drywall by market share and the facts connecting it to the alleged conspiracy are, as the Court recognized, extensive." (Resp. at 11.)

This evidence, although material in our analysis of other defendants' behavior, is not applicable to our analysis of Gypsum. Without further traditional evidence, the first fact is not enough for Plaintiffs to survive summary judgment, at least as to Gypsum, as it was not enough in the case of CertainTeed, who also had employees attend the Las Vegas trade meeting. With regard to the second two facts, which address communications between defendants and industry analysts, the Court concludes that these facts are immaterial to Gypsum's liability. In particular, as laid out above, Gypsum was cautious in its interactions with individuals at Thompson and Longbow, often withholding information, leaving the analysts to speculate about what Gypsum would do. (See, e.g., Suppl. Ex. 28; Suppl. Ex. 27; Ex. 1275.)[9]

### c. Whether the USG Defendants are similarly situated to CertainTeed

The USG Defendants contend that they are most similarly situated to CertainTeed, who this Court granted summary judgment in favor of, noting that "there is a dearth of evidence of any communications by CertainTeed or other plus factors that could create the inference of conspiracy." (Mem. Op. at 150-51.) In considering evidence against CertainTeed, the Court refused to consider statements by other Defendants against CertainTeed because the record did not show communication between CertainTeed and other defendants. (Id. at 151.)

---

[9] In addition to the reasons laid out in this paragraph, for the reasons outlined in the Court's previous discussion of co-conspirator evidence and Bourjaily v. United States, 483 U.S. 171 (1987), these co-conspirator statements are not admissible against a defendant who the record demonstrates was not part of the conspiracy. (See Mem. Op. 37-50.)

Defendants urge the Court to conclude, as we did with CertainTeed, that Plaintiffs have presented no evidence that Gypsum provided information to analysts like National and Lafarge, or that it spoke with a competitor before making a pricing decision. (Reply at 29.) The Court agrees that Gypsum, like CertainTeed, had minimal contact with industry analysis.

In spite of some similarities the Court's analysis of Defendants' motion has with our previous analysis of CertainTeed, however, the Court rejects Defendants' argument that our previous decision warrants a grant of summary judgment to all Defendants. There is substantially more evidence that Plaintiffs have been able to produce against the USG Defendants, L&W in particular, than Plaintiffs were able to show against CertainTeed. However, by the same token, the Court finds that there is substantially less evidence as to Gypsum than the other defendants, including the other remaining defendant PABCO. Gypsum was more careful in coming to a number of unitary decisions, as discussed below, and there is no direct evidence in the record that any Gypsum employee specifically made a pricing agreement with any competitor.

### d.     Defendants' evidence of "independent decision making"

Defendants also attempts to distinguish themselves from other manufacturers by demonstrating how the September 2011 pricing letter was the "culmination of over a year of well-documented internal debate of how to modify [Gypsum's] pricing policies to try to bring its wallboard operations back to profitability." (Mot. Memo. at 3.)

Defendants demonstrate their alleged independent process through a timeline that begins in April 2010, when Salah at Gypsum began to discuss ending job quotes. (Id.) In a draft letter, proposed to be mailed in July 2010, Gypsum proposed ending job quotes. (Id. at 3-4) (citing Ex.

767).[10] Although Gypsum ultimately did not end up sending that letter or eliminating job quotes at that time, conversations continued among the sales team and with some customers. Salah addressed these conversations in his deposition: "I had a very small number of conversations with contractor customers between 2010 and 2011 regarding if we moved away from job quotes and went to spot market pricing, would those customers still buy from us." (Suppl. Ex. 1, Salah Dep. 350:10-15.) Salah testified that Gypsum "had customers that had suggested we just have one [price] increase, and it was a wild one. One customer in particular, who I had great respect for, said, Just go up $30 on January 1st and that's your price for the year, and let the chips fall where they fall." (Id. at 393:14-20; See also Suppl. Ex. 2, Griffin Dep. 179:12-18 ("[W]hen we had conversations in 2011 with some of our contractors that are below—[Gypsum] contractors, what we really learned from them was that they wanted some price certainty; and that if we could not give them certainty for a year on price, a not-to-exceed number, that that could be an alternative to doing job quotes."))

In July 2011, Salah began to raise the possibility of ending job quotes again, sending a draft customer letter, dated September 1, 2011, to his team on July 22. (Mot. Memo. at 5) (citing Ex. 769). In the email attached to that draft, Salah said "We have discussed this in the past and I

---

[10] Notably, that draft customer letter said that Gypsum was ending its practice of providing job quotes because

> (1) Job quotes and price protection are regularly abused in the market and difficult to manage
> (2) Job quotes and price protected volume offer insurance for dealers/contractors. However, if wallboard pricing declines, dealers/contractors typically buy at the lower market price versus the job quote
> (3) [Gypsum] is attempting to simplify pricing and profitably manage our operations

(Ex. 767.)

am thinking through what can be done differently to turn around our wallboard business. I am not sure if we have enough time to wait for the market to recover." (Ex. 769.) This email "sparked internal debate that lasted through July and into September." (Mot. Memo. at 5.) After an August 2, 2011 meeting, Salah sent an email to his sales team stating, among other things, "[w]e all agreed last week that job quotes and price protection are the root cause to our pricing problems." (Suppl. Ex. 4.) In that same email, Salah also said "[p]lease do not forward or speak to anyone regarding this outside of our team." (Id.) More internal conversations throughout August and September led to the eventual announcement on September 28, 2011. (Suppl. Exs. 6 & 7.)

Further, Defendants point to deposition testimony from both Salah and Griffin that they were surprised about American's announcement. (See Suppl. Ex. 2, Griffin Dep. 195:13-17; see also Suppl. Ex. 1, Salah Dep. 105:9-11.)

Plaintiffs respond to this argument by putting forward a graphic entitled "[Gypsum] Defendants' Road to a Functioning Conspiracy" and by walking through facts relating to Gypsum's previous unsuccessful price increases. (See Resp. at 24-25.) Many of these facts have been laid out above.

In light of all of the facts above, the Court is convinced that Gypsum acted independent to institute its price increase. Like CertainTeed, and unlike other defendants, Gypsum put forth evidence that it arrived at its conclusion to raise prices and eliminate job quotes on its own, as a result of months of internal debate and discussion. Moreover, Gypsum's September 2011 announcement differed in significant ways from the others in that it did not announce a blanket percentage increase but issued price increases customer-by-customer. Accordingly, the Court will grant summary judgment in favor of Gypsum.

Plaintiffs have, however, successfully produced evidence to raise an inference that L&W was using its position as a distributor to be a conduit between the defendants about their pricing intentions.[11] In its dual role as both a purchaser of and distributor of drywall, mainly from Gypsum, but also from other defendants, L&W was prone to many more frequent and substantive pricing decisions than its sister corporation. The Court cannot conclude that L&W is entitled to summary judgment. A jury may find that L&W's conduct was purely as a distributor and its communications with manufacturers, which undoubtedly concerned prices, were entirely innocent of any conspiracy to fix prices. On the other hand, some of the evidence would allow a jury to conclude that L&W was acting as an agent for its sister corporation involved in the agreements that the Court found sufficient to deny summary judgment as to the other defendants in the prior opinions.

## VI. CONCLUSION

Based on the preceding exhaustive examination of the evidence, the Court concludes that it is duty-bound to consider each of the three corporations moving for summary judgment separately, in spite of Plaintiffs' assertion that the three entities should be treated as one.

It is clear that there is minimal, if any, evidence that USG Corp., the parent corporation, has been directly involved in communications with competitors regarding prices. The Court finds no evidence to support a conspiracy charge against USG Corporation, as justified by the

---

[11] This is consistent with the Court's discussion in our Memorandum on Defendants' Motion to Dismiss. (ECF 422.) There, the Court wrote that "because L&W is a wholly-owned subsidiary of USG [Corp.], the allegations about L&W must be considered as allegations against USG [Corp.]." (Id. at 8.) The Court noted, however that in spite of there being "sparse . . . references to things L&W did or said . . . there are sufficient allegations to support a claim that L&W was an intermediary, and thus the claims against USG [Corp.] are as both a member of the conspiracy and an intermediary." (Id.) Of course, in light of nearly two years of litigation, Plaintiffs have been able to put forward more substantial evidence against L&W than it had at that time.

foregoing detailed discussion, and for the reasons that the Court granted summary judgment in favor of CertainTeed, the Court will grant summary judgment in favor of USG Corporation.

As to Gypsum, the record is clear that it was involved in both manufacturing and selling domestic drywall to a variety of companies, primarily to distributors. There is some evidence of potential contact between Gypsum employees and competitors at trade meetings, but Plaintiffs have failed to produce evidence showing that those potential communications regarded pricing. Gypsum made several efforts, in April 2010, May 2011, and July 2011, to raise its own prices and end job quotes, but its competitors failed to follow through and Gypsum had to retreat. The Court has carefully examined the "traditional conspiracy evidence," and concludes that although there is a "smattering" of communications, that somewhat differentiate Gypsum from CertainTeed, there was less quantum and less quality evidence against Gypsum compared to American, National, PABCO, and LaFarge. Further, the evidence presented by Plaintiffs reviewed above fails to show that Gypsum was acting against its self-interest, and several of its pricing decisions and implementations were different from its competitors.

In addition, applying the most recent Third Circuit decision on price-fixing in oligopolistic markets, Valspar, the Court must hesitate rather significantly in assessing the evidence because in that case, the court affirmed the grant of summary judgment in favor of the defendants, and this Court is unable to conclude that Plaintiffs have made showings that are significantly different than the showings that were made against the defendant in Valspar.[12]

---

[12] For example, the traditional conspiracy evidence presented by the Valspar plaintiffs were: data-sharing platforms used by a trade association to which the defendant belonged, trade association meetings (which the district court found did not show evidence of discussion of prices and "certainly no evidence of an agreement"), the use of industry consultants "as conduits to funnel information," emails showing that "competitors were aware of the phenomenon of conscious parallelism and implemented pricing strategies in response to it," and inter-competitor sales at below market prices. See Valspar, 873 F.3d at 197-201.

Furthermore, there is no evidence that Gypsum used Longbow or Thompson, industry analysts, and sometimes communicators of pricing decisions amongst Defendants, as a conduit to join in an agreement to fix prices.

The Court cannot say that the Plaintiffs have presented evidence that Gypsum's decision to end job quotes was conspiratorial and the evidence against Gypsum on this issue is also significantly less persuasive than the Court found as to Gypsum's competitors, American, National, PABCO, and LaFarge. For these reasons, although it a close case, the Court has determined that the Plaintiffs have not shown a genuine issue of disputed fact sufficient to warrant a jury finding in favor of Plaintiffs against Gypsum.

As to L&W, the Court recognizes it is a sister corporation to Gypsum and is wholly owned by USG Corp. L&W was not a manufacturer, but was one of the major national drywall distributors. In this position, it was natural and expected for L&W to be communicating with competitors of Gypsum because L&W was also a customer of these competitors.

Based upon on the summary judgment papers, the Court cannot determine as a matter of law that the communications L&W had with co-defendants were purely communications pertaining to sales that were part of L&W's principal business, and were not conspiratorial in nature. There is some evidence upon which a jury might find that L&W acted as a "conduit" of pricing information. This finding, although not sufficient in and of itself to prove an agreement, could be part of a mosaic of evidence that may be sufficient to warrant a finding that L&W had reached agreement with its co-defendants.

The Court recognizes that L&W, because it was not a manufacturer of drywall, may have had less of a motive or interest to fix prices than its co-defendants. However, given L&W's position as a sister corporation with Gypsum, and within the USG corporate family, there is

some evidence from which a jury could find a motive for L&W to be supportive of the price increases that had been agreed to by the other defendants. L&W's position in the drywall industry as being only a distributor and not a manufacturer does not insulate it from liability for assisting in a price-fixing agreement entered into by other competitors. The Court recognizes that L&W may have very significant defenses, but cannot grant summary judgment based on the evidence of record summarized above.

**BY THE COURT:**

**/s/ Michael M. Baylson**

**MICHAEL M. BAYLSON, U.S.D.J.**

O:\13-MD-2437 - drywall\15-cv-1712 - drywall\15cv1712 Memo re USG Def SJ.docx